# Bird Coal & Iron Co., Appellant, *v.* Humes.

[Marked to be reported.]

*Corporations—Stockholders—Directors—Contract with lessee.*

A stockholder of a mining corporation who has filed a bill in equity to enjoin a lease of the company's land, may make a valid contract with the lessee by which, in consideration of his discontinuing his suit, he is to receive from the lessee a bonus for every ton of coal mined by the lessee; and if the circumstances remain the same, the fact that the stockholder becomes a director, will not affect his right to receive such bonus.

*Duties of directors—Secret profits.*

The director of a corporation is a trustee for the entire body of stockholders, and by assuming the office, he undertakes to give his best judgment in the interests of the corporation in all matters in which he acts for it, untrammeled by any hostile interest in himself or others; and all secret profits derived by him in any dealings in regard to the corporate enterprise must be accounted for to the corporation, even though the transaction in which they were made was also of advantage to the corporation.

A stockholder of a mining corporation filed a bill in equity to enjoin the company from carrying into effect a lease of the company's coal lands, alleging that the royalty of fifteen cents per ton was grossly inadequate. In consideration of his discontinuing the suit, the lessee agreed to pay him individually an additional three cents per ton on all coal mined under the lease. After the lease had continued for several years, the stockholder became a director. Shortly after his election, the lessee requested a reduction of the royalty payable under the lease, on account of competition and the low selling price of coal. The director wrote a letter to the president of the company advising a reduction of three cents per ton, but without revealing to the president or to the company the secret agreement by which he himself received three cents per ton from the lessee. By a resolution of the board of directors the royalty was reduced three cents a ton. The reduction appeared to be a wise step to the interest of all parties. *Held :*

1. That the director had a right to receive the three cents bonus up to the time of the reduction of the royalty.

2. That after the reduction of the royalty, he was bound to account to the company for his profit by the transaction, which was one sixth of three cents per ton,—the amount that was saved to the director by deducting the three cents from the five sixths of the royalty in place of from the whole royalty, as should have been done.

Argued April 23, 1893.   Appeal, No. 397, Jan. T., 1893, by plaintiffs, from order of C. P. Centre Co., April T., 1891, No. 295, entering judgment of nonsuit in favor of E. C. Humes.

Before STERRETT, C. J., GREEN, MITCHELL, DEAN and THOMPSON, JJ.

Account render for secret profits alleged to have been wrongfully received by a director of a corporation.   Before BARKER, P. J., 47th judicial district, specially presiding.

The facts appear by the opinion of the Supreme Court.

The court below entered a compulsory nonsuit and subsequently refused to take it off, in the following opinion:

" It must be conceded that there can be no recovery here unless the plaintiff can show that the defendant received money to which the plaintiff in law or in equity would be entitled as a corporation, and we are still of the opinion that the receipt of money has not been shown of which any part, either in law, equity, or good conscience would belong to said corporation. The lease between the Bird Coal & Iron Company and James Sommerville was made without the knowledge of defendant; immediately upon learning of it, he took steps to have it legally set aside, asserting that it had been made upon such terms that it was disadvantageous to him, although advantageous to the stockholders instrumental in having it made; and, so far as shown by the evidence, all others interested acquiesced in this lease.   The lessee, and those who were to obtain the coal from him, were anxious to have the lease consummated on some terms, and the latter agreed to pay to Mr. Humes, individually, such an amount, in addition to the amount to be paid to the corporation, as would make the lease advantageous to him, and induce him to remove the legal obstacle he had placed in its way.   Why then should he share the proceeds of this arrangement with the other stockholders, who were satisfied with the amount previously agreed upon by the officers.   He was not a party to the agreement of lease, except as bound by the acts of the corporate officers ; the other stockholders, through the officers of the company, made an arrangement satisfactory to them, but unsatisfactory to him, and he, on his part, had a perfect right to make an arrangement supplemental to theirs, which made it satisfactory to him, and as we view the law, he would not be compelled to account to any one for the proceeds of this arrangement.

" We concede that it is unusual for a dissenting stockholder

in a corporation to realize on his stock in this manner, but where it is not done to the loss, prejudice, or injury of the other stockholders, and is not the result of contracts regarding corporate property which he had been instrumental in having made, we see nothing inequitable in it, and more especially where, as in this case, the money received was, so to speak, the price of his acquiescence in corporate acts, satisfactory to the other stockholders.

" But it was contended that when he became a director of the company there was such a fiduciary relation between him and the company that he would be bound to account for all money received from any dealings in regard to the corporate enterprise. But if we are correct in ruling that there can be no recovery from him for the amount received when he was a mere stockholder, we cannot see how liability would attach when he became a director. There was no new contract made, and he did not so manage the affairs of the company, as a director, as to receive any secret profit detrimental to the interests of the company; he merely continued to receive the amounts due him according to the terms of a contract made before he became a director. We can readily see how a stockholder would be liable to a corporation for secret profits growing out of a contract which he had induced the company to make, and we can more readily see how a director would be liable to a corporation for any amount received by him growing out of any transaction brought about by him as a director, but the facts of this case do not bring the defendant within the principles involved above.

" Counsel for plaintiff relied on the general principles found in the text books to sustain their position. Let us see how far they are sustained by the authorities cited by them. They cite Story's equity jurisprudence, for the principle that the directors of a corporation are trustees for the shareholders, and are bound to the same rules of good faith as is required between principal and agent between each other. ' On the whole, the doctrine may be generally sustained that wherever confidence is reposed, and one party has it in his power in a secret manner for his own advantage to sacrifice those interests which he is bound to protect, he will not be permitted to hold any such advantage.' We know of no principle that would require an agent to return to his principal moneys received before his

agency commenced or after his agency commenced, under an arrangement made before whereby his principal suffered neither loss nor damage. When Mr. Humes made the agreement with Harned, Jacobs & Co., he did not have ' it in his power in a secret manner for his own advantage to sacrifice the interests he was bound to protect.' He did not receive the money now sought to be recovered, because confidence had been 'reposed in him.'

" ' The directors of a corporation are so far trustees for the company, that they cannot derive directly or indirectly out of their position any profits or other advantage, save with the knowledge and concurrence expressly or impliedly given by the company.' Potter on Corporations, volume 1, page 441. Mr. Humes did not derive profits or other advantage ' out of his position ' as a director.

" Morawetz on Corporations, Taylor on Corporations, Angell & Ames on Corporations, were cited to sustain the principle that directors are liable to account for all secret profits made out of any dealings in regard to the corporate enterprise. The first author in the section cited says : ' They have no right under any circumstances to use their official position for their own benefit or the benefit of any one except the corporation itself.' Mr. Humes did not so use his official position. ' The directors of a corporation have no right to use either its assets or its credit or any of the powers of their office, except to advance the interests of the company, irrespective of their advantage or desires. Thus it has often been decided that the directors have no right to stipulate for a bonus or commission to be paid them by a person with whom they enter into a contract on behalf of the company, and it is equally well settled that they cannot by any arrangement secure to themselves a share in the profits of any transaction to which the company is a party.' Mr. Humes neither used the assets or credit of the corporation nor any of the powers of his office in the transaction complained of, nor did he stipulate for a bonus or commission to be paid by any one with whom he entered into a contract ' on behalf of the company,' and he did not, as a director, secure a share of the ' profits of any transaction to which the company was a party.'

" ' Directors of the company cannot exercise their powers for their own personal ends against the interests of the company.

They cannot derive any advantages from contracts made by their authority as directors, except through the company for which they acted:' Wardell v. Union Pacific Railroad Co., 103 U. S. 651, also cited by plaintiff's counsel.   We fail to see where Mr. Humes exercised any powers of ̂a director for his own ends ' against the interests of the company,' or where he derived any advantage from any contract made by his authority as a director.

" Without further reference to the authorities cited, we might add that we find the same qualification running through them all,—that the transaction out of which the profits result or the director receives a benefit must be one to which the director was a party as a director, or in which he exercised his power as a director, and the principle invoked only having relation to the management of the corporate business.   Nowhere do we find a director held liable, except he has used his position to advance his individual interest as distinguished from that of the corporation.   Applying these principles to this case, we find nothing which would warrant us in saying under all the facts before us that there was anything in the conduct of Mr. Humes, as a director of The Bird Coal & Iron Company, which so connected his position as a director with the agreement under which he received the money referred to above from Harned, Jacobs & Co., that the other stockholders of the said corporation would have a right to share in the same.

" It was shown in evidence that, during the time Mr. Humes was a director, the royalty to be paid by the lessee was reduced to twelve cents a ton, by reason of the depression existing in the coal trade, and it was sought to be shown by certain letters written by Mr. Humes to the president of the company that he induced and advised the officers of the company to make this reduction, and, it was claimed, that in concealing from the company at that time that he was receiving a ' bonus ' from the lessee, he acted in bad faith and rendered himself liable for the amount so received.   The letters offered in evidence seemed to be in reply to others from the president of the company to him, which we have not seen, but we do not gather from these letters that Mr. Humes induced the officers of the company to make this reduction ; he seems to have been consulted by them in relation to it, and assented or advised it as better than

the alternative of having all royalties cease, but we fail to see anything in this fact to render him liable in this action, if we are correct in ruling that on the other facts in the case he was not liable."

*Error assigned* was refusal to take off nonsuit.

*John G. Love* and *J. C. Bucher, J. H. Rockefeller* with them, for appellant.—Corporate officers may not buy from or sell to their corporation and retain any profits from such transaction ; for all secret profits derived by them from any dealings in regard to the corporate enterprise they must account to the corporation.   These principles are well established by the decisions and have become elementary principles of law : Taylor on Corporations, § 629 ; Ry. v. Poor, 59 Maine, 277 ; Parker v. Nickerson, 112 Mass. 195 ; Simons v. Vulcan Oil Mining Co., 61 Pa. 202 ; Densmore Oil Co. v. Densmore, 64 Pa. 43.

It is clear that a director has no right to sell his influence in the management of the company, or to enter into any agreement by which his official action would be influenced or controlled : Morawetz on Corporations, 2d ed., § 519.

The directors of a corporation are trustees for the stockholders and creditors of the corporation, and are so far trustees for the company that they cannot derive directly or indirectly out of their position any profits or other advantage, save with the knowledge and concurrence expressly given of the company : Taylor on Corporations, sec. 630.

*C. M. Bower, John H. Orvis* and *Ellis L. Orvis* with him, for appellee.—Appellant had the legal right to make the contract under which he received the bonus of three cents a ton, and the fact that he became a director did not affect his right under the contract.

What appellant advised as to the new agreement was not only to his own interest as a stockholder but to the best interest of every stockholder.

OPINION BY MR. JUSTICE DEAN, October 2, 1893 :

The Bird Coal & Iron Company, the appellant, is a corporation ; it is the owner, among other lands, of a tract in name of James Butcher, underlaid with coal, in Snowshoe township, Centre county.   The capital stock of the company was 100,000

shares of the par value of $50.00 per share; of these E. C. Humes, appellee, owned 21,977. On the 28th of September, 1881, the company leased all the coal on this tract for five years to James Somerville, at a royalty of 15 cents per ton of 2240 lbs.; Somerville covenanted to mine not less that 20,000 tons each year, and had an option of a further period of five years on the same terms; the first five years were to commence January 1, 1882. On October 4, 1881, Somerville advanced to Joseph Bird, for the company, $5,000 on the royalty. With this contract the appellee had no connection; he held no official position in the company; was simply a stockholder. When he learned of the lease, he made vigorous objection, alleging the royalty and annual minimum output were too low, and so he filed a bill in equity against the company, Somerville and J. R. Peale, Esq., the attorney of the company, who was also interested, with Somerville, in the lease, averring gross inadequacy of consideration, etc., and asking that the lease be declared void, and defendants be enjoined from carrying it into effect; a preliminary injunction issued, which afterwards was dissolved. But the lessees, or those interested in the successful operation of it, procured a discontinuance of his suit by agreeing to pay him individually an additional three cents per ton on all coal mined under the lease. Somerville went on then with his mining operations, and near the close of the first five years term ceased mining, alleging that all the marketable coal on the Butcher tract was exhausted.

On July 18, 1884, Mr. Humes became a director of the company; he accepted and served in the office. About the first of August following his election, Somerville and his associates requested a reduction of the royalty payable under the lease on account of competition and lower selling price in the market. Correspondence in reference to the matter was then had between Pemberton Bird, president of the company, and Mr. Humes. Bird's letters are not before us, two of Humes's are. The first is as follows:

BELLEFONTE, Pa., Aug. 9th, 1884.
PEMBERTON BIRD, ESQ., President,
          Northumberland, Pa.

Dear Sir:

I have yours of the 8th, and agreeably to your request have

just had a talk with Mr. Somerville in reference to a reduction of the royalty. He states that they have lost several large customers, in consequence of their having been underbid by Boak, Orvis & Co., and other parties, and they shall probably lose more unless the price of coal is reduced at least five cents per ton to consumers. Of course, we do not wish to have the mines stand idle, and therefore I have said to him that I would suggest and advise a reduction on the royalty of three cents per ton for the present, and until notice was given to the contrary, we reserving the right to notify them, whenever, in our opinion, the condition of the market would warrant it. If this is done, I think he can induce his men to yield a trifle in order to secure full time.

Truly yours, etc.,

E. C. HUMES.

P. S. If this meets your views, perhaps you had better advise me immediately, fixing the time to commence.

The second letter, dated August 26, 1884, addressed same as first, is as follows :

Dear Sir :

In reply to yours of 25th, I have to say, that, after some reflection, I have arrived at the conclusion that, in view of the great depression and competition in coal, it possibly might be unwise for us to decline the proposition of Harned, Jacob & Co., although I do not quite like extending the time during the year 1885, still, as the projected railroads are opening up a vast area of new territory, it is probable a change for higher royalty will not occur soon, hence I would suggest that we agree to continue the reduction of three cents per ton for one year, say from September 1, 1884, on all shipments over the 20,000 stipulation in the agreement; and this strikes me as reasonably fair, if they are not bound to take out more than 20,000 tons. At the same time, they would have an inducement to exceed this quantity. I shall be satisfied with your making this proposition, and I am induced to think they will agree to it.

Truly yours,

E. C. HUMES.

Between the dates of these two letters, on August the 16th, 1884, a meeting of the board of directors was had, Mr. Humes not present. The minutes show this business : " The president

stated the object of the meeting was in relation to a request of James L. Somerville and his associates in relation to abatement or draw-back on royalty paid by them on coal. Whereas the competition on bituminous coal is now very great and the price of said coal is quite low, and whereas James L. Somerville and his associates have asked this company to allow them a draw-back or abatement on the royalty on coal mined and shipped by them from the company's land in Centre county, in order that they may compete in the markets; therefore on motion: Resolved, that the Bird Coal & Iron Company give for the time being a draw-back or abatement of three cents per ton on the royalty in favor of J. L. Somerville and his associates, lessees, on all coal mined and shipped from this company's mines in Centre county, provided the said lessees shall mine and ship at least 7000 tons of coal per month. This draw-back shall cease and determine at the pleasure of this company. Carried. Letter of E. C. Humes, director, received August 9, 1884, recommending the above resolution ordered filed. On motion adjourned. John H. Vincent, secretary."

Mr. Humes did not disclose the fact to any of his associate stockholders, or to any of the officers of the company at any time, that he had an individual contract, by which he was in the receipt of an extra three cents per ton on all coal mined under the lease, nor does it appear that any of them, during the existence of the lease, had knowledge of such fact. Altogether, Mr. Humes received under his special agreement $8,310.83. It does not appear just how much of this amount was received after the reduction was made.

After the facts became known to the company, it brought an action of account render against Humes, claiming: (1) That, as a stockholder, he had no right to make a secret agreement to receive a special profit, and that the whole of the money, received by him, in equity belonged to the company. (2) That, as director, he induced the company to make an abatement of the royalty, while he was secretly in receipt of a special profit, and the fiduciary relation between him and the company demands that he account to the company for this profit received after his directorship commenced.

After the evidence had been heard for plaintiff in the court below, a compulsory nonsuit was entered, which the court af-

terwards on motion refused to take off.   From that decree, this appeal is taken, appellant assigning for error the refusal of the court to take off the nonsuit.

The learned judge of the court below, in an opinion refusing to take off the nonsuit, very concisely and clearly demonstrates, from both reason and authority, that appellee is not bound to account to the company for any money received by him on his special agreement before he assumed the office of director, about the time the abatement of three cents per ton was made on the 16th of August, 1884.

But as to the second point raised by plaintiffs, he says : " But it was contended that when he became a director of the company there was such a fiduciary relation between him and the company, he would be bound to account for all money received from any dealings in regard to the corporate enterprise:   But if we are correct in ruling that there can be no recovery from him for the amount received when he was a mere stockholder, we do not see how liability would attach when he became a director.   There was no new contract made, and he did not so manage the affairs as a director as to receive any secret profit detrimental to the interests of the company ; he merely continued to receive the amounts due according to the terms of a contract made before he became a director."

In thus failing to draw a distinction between the duty of the appellee as stockholder and director, we think there was error. There was a radical change in his relations to the company the moment he assumed the office of director.   As stockholder, being the owner of his shares absolutely, he had a right to manage his own property as suited his own notions.   It is one of the purposes of corporate organization of capital to facilitate the independent enjoyment and use by each member of his fractional interest in the whole.   But a director is a trustee for the entire body of stockholders, and both good morals and good law imperatively demand he shall manage all the business affairs of the company with a view to promote, not his own interests, but the common interests, and he cannot directly or indirectly derive any personal profit or advantage by reason of his position, distinct from his co-shareholders :   Potter on Corp., vol. 1, sec. 330 ; Morawetz on Corp. 517, 518.   And by assuming the office, he undertakes to give his best judgment in the

interests of the corporation in all matters in which he acts for it, untrammeled by any hostile interest in himself or others. There is an inherent obligation on his part that he will in no manner use his position to advance his own interest as an individual as distinguished from that of the corporation: Cumberland Coal Company v. Parish, 42 Md. 598 ; Hill v. Frazier, 22 Pa. 320. And all secret profits derived by him in any dealings in regard to the corporate enterprise must be accounted for to the corporation, even though the transaction in which they were made also advantaged the corporation of which he was director: Parker v. Nickerson, 112 Mass. 195. It is a waste of time to cite other of the numerous authorities for these general and familiar principles, for we do not understand them to be questioned. The real contention is, whether the appellee in his conduct has brought himself within the operation of these principles.

This appeal is from a judgment of compulsory nonsuit. The evidence of plaintiff in the court below must be taken as establishing the facts testified to, or apparent from the books and documents submitted ; any reasonable inference which might have been drawn from them must also be taken in appellant's favor. If defendant's side had been heard, there might have been contradictory evidence of the alleged facts ; by his explanations, unfavorable inferences from the facts might have been shown to be wholly unwarranted. But in reviewing this judgment we have nothing to do with his side of the case as it might have been presented. Our duty is solely with plaintiff's side as it was presented in the most favorable aspect the evidence will warrant.

We assume, then, the existence of this individual agreement was wholly unknown to the company at the time of Mr. Humes's election as director, and afterwards, up until the demand for an accounting from him. We may remark, that the fact of it did not necessarily affect his official action. Having been made at a time when he had the undoubted legal right to make it, its existence, if circumstances remained the same, would in no respect warp his judgment or impair his devotion to the interests of the company. So, although it would have been wise to disclose it at the time he accepted the office, there was no imperative duty on him to do so.

But circumstances did not remain the same. Somerville alleged that owing to increasing and fierce competition in the coal business, his bargain, which had been, when made, a fair one, had become a very hard one, and that he could not continue operations unless the company made a concession in the royalty. The president of the company, Mr. Bird, being ignorant of the special agreement with Director Humes, in all his negotiations with Somerville in regard to a reduction, acted on the assumption that fifteen cents per ton was the whole royalty then being paid. This class of contracts, although called leases, and having some of the legal incidents of leases, are generally, in fact, sales of the coal in place at a price per ton to be paid as the coal is mined. The one before us is a sale of the coal at the price or royalty of fifteen cents per ton, payable monthly. A reduction of five cents per ton was first asked by Somerville, but the company refused to concede this, and whether three cents would be allowed with an increase of the annual minimum output from 20,000 tons to 84,000, became a subject of consideration by the company. If the three cents reduction was made, it would knock off, from the price first agreed to be paid, $2,520 on every 84,000 tons, and, as both parties seemed to estimate, there remained in the tract five or six years' work, the aggregate reduction from the purchase money as fixed would have amounted to from fifteen to twenty thousand dollars; it was simply a reduction of twenty per cent on the purchase money for all the coal not yet mined; certainly a large concession. So far as concerned the right of the company and the obligation of Somerville, it was a wholly new contract, and resembled somewhat in its features the composition of an embarrassed debtor with his creditor for a release on payment of a part of the debt; Somerville was willing to pay, if the company would accept and release him, eighty per cent of the real debt. In a transaction of such moment to the company, it had a legal and moral right to the best judgment of all its directors, unembarrassed by any concealed antagonistic interest. The president of the board very properly sought the advice of Director Humes, and that very fact indicated the responsibility and power of the director's office. Somerville had in effect represented to the company he could not pay fifteen cents per ton; both he and Director Humes knew this was false, for the concession of three cents, which he

was willing to accept, would be a reduction from eighteen cents to fifteen.   Mr. Humes then has a talk with Somerville, and writes to the president, suggesting and advising that the company make a reduction from the contract price of fifteen cents to twelve cents, and the obvious inference from his language is, that this concession should be made because of Somerville's inability to pay fifteen cents.   He gives no intimation that Somerville had actually been paying eighteen cents, three of which went into his own pocket and was to continue to go there, unaffected by the new agreement he was advising the company to make.   Was this the truth?   If ever there was suppressio veri, it seems to us, on the evidence as it stands, Director Humes was guilty of it, in not at once disclosing that Somerville was able to pay more than twelve cents, and had in fact been paying him, extra to the contract price, three cents per ton.   And the inference is, that his advice induced the company to at once reduce the royalty, as they thought, from fifteen to twelve cents, while Somerville and Humes knew it was from eighteen to fifteen cents.   The minutes show this in appending to the resolution this statement: "Letter of E. C. Humes, director, received August 9, 1884, recommending above resolution, ordered to be filed."

The suggestive interrogatory then is, what was the motive for this disingenuousness and disregard of a manifest official duty?

If the facts be as appellants on their unanswered testimony claim them to be, then it is not an unwarranted inference that Director Humes made for himself, by reason of his official action, a profit outside of and distinct from the other stockholders, for which he ought to account.   It is argued, fairly, that he protected his three cents by getting the reduction on the company's fifteen.

It is a mistake, however, on this view of the facts, to assume, as appellants have assumed, that the whole three cents per ton belongs to the company.   He had the right to receive the three cents at least up until the corporate action of the company, prompted by him, lost it twenty per cent of the contract price, while the director lost nothing.   His profit by the transaction is all the company can equitably claim.   What was his profit?

As the evidence stands before us, there is no legal conclusion

which works a forfeiture of the whole three cents per ton.   If on satisfactory proof it had been shown that a corrupt arrangement had been made, between the director and lessee, whereby, in consideration of the former's influence in getting the price reduced to twelve cents, he was to have three, of course the profit would have been the whole sum received.   But here, the director was in the rightful receipt of three cents; appellant alleges that the understanding fairly inferable from his conduct, and the fact of no change in his three cents, was, that he retained his three cents undiminished because of his influence in securing the reduction by the company, and therefore he must pay over to the company the whole of it.   This argument, however, ignores the significance of what plaintiffs failed to prove ; there was no proof that the reduction of the royalty, with the increase of the minimum, was not wise as a business transaction, or that the suggestion of a reduction, in the letter of August 9, 1884, was not warranted by the changed circumstances ; on the contrary, so far as appears, this was a judicious step.   If that be so, he must account only for what he gained, by his concealment of a material fact.

Assuming, then, that the reduction was, under the circumstances, a proper one, what reasonable inference as to the director's profit may be drawn from the evidence?   There ought, says he in substance, to be a reduction of three cents, otherwise the mines will stand idle.   A reduction on what?   Clearly, as he knew, on the eighteen cents then being paid.   He also well knew that President Bird and the other members of the board would act on the assumption that fifteen cents was the royalty then being paid, and if they did as he advised, would reduce the company's fifteen cents to twelve; would do this because ignorant of a material fact which it was his duty as director to disclose.   If they had known he was in receipt of three cents, while that fact would not have affected the propriety of a reduction, they would have been bound, in fairness to the company, to have insisted that the three cents should be taken from the whole royalty, and not exclusively from five sixths of it, for it was as much the interest of the man in receipt of one sixth to have the mines running, as of those receiving five sixths.   His profit, then, by concealment of the truth, was just what he saved in the reduction, one sixth of three cents from

the time the change by his advice went into effect, and for this he ought to account. Even if, to protect his three cents from diminution, merely, he used his influence to saddle the whole reduction on the company, he did nothing which warrants the penalty of forfeiture to the company of that which it had not lost, and to no part of which, before the reduction, it had any pretence of claim.

This discussion of the question is based exclusively on the facts as here presented; as they may present a very different appearance on a retrial, our conclusions then may have no value.

The judgment is reversed, procedendo awarded.

[Marked to be reported.]