## Baily et al. *v.* Ramsey et al.

*Equity—Equity practice—Parties—Corporation—Objection to nonjoinder of corporation—Laches.*

1. A corporation which will not be entitled to receive, and cannot be required to pay, any part of the amount which may be recovered in a suit on a particular cause of action, is not a proper party to such suit.

2. Objection to the nonjoinder of a corporation in a suit in equity, is made at too late a date if not presented until after the adjudication is filed.

*Equity—Equity practice—Objection made too late—Laches—Amendments.*

3. Objections to a bill in equity, which, if promptly made, could be overcome by amendments, are too late to be considered, if not presented until after the testimony is closed; under such circumstances, the court will treat the pleadings as if amended, or will allow an amendment to be made at any time, even in the appellate court, if it is deemed wise so to do.

*Appeals—Failure to raise question in court below.*

4. Ordinarily an appellate court will not reverse the court below for not doing that which it was not asked to do.

*Equity—Rules 53 and 57—Findings of fact—Synopsis of evidence—Appeals—Quashing appeal.*

5. Under equity rules 53 and 57, an objection to the finding of, or refusal to find, a fact may be disregarded and the appeal quashed, if the brief does not contain a synopsis of the pertinent evidence on the point, with a reference to the pages in the record where that evidence may be found.

*Corporations—Misconduct of directors—Treasurer.*

6. One who has been elected director of a corporation, but does not serve as such, nor otherwise take part in its management, cannot be held liable for the wrongful expenditure of money by those who acted as directors.

*Appeals—Evidence—Inferences.*

7. In determining whether or not there is any evidence of a fact, which an appellant in equity alleges was not proved, all the evidence favorable to appellee (except such as the chancellor refused to believe), and all inferences in his favor which may fairly be deduced therefrom, must be taken as true.

Argued January 26, 1926. Appeals, Nos. 83, 84, 85, 86 and 87, March T., 1925, by Edmond Englert, W. F. Hofmann, George Weil, J. W. Buchanan and P. N. Ramsey, from decree of C. P. Allegheny Co., April T., 1923, No. 388, against defendants, on bill in equity, in case of R. Lloyd Baily, Eli G. Baily, John F. Baily, H. Hellan, L. N. Burnett, T. F. Biggins, Sarah E. McClenathen and E. J. Sanders v. P. N. Ramsey, F. N. Boyle, Edmond Englert, W. F. Hofmann, George Weil, James D. White and J. W. Buchanan. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART and SADLER, JJ. Nos. 83, 84, 85 and 87 affirmed, No. 86, reversed.

Bill against directors of corporation for alleged negligence. Before MACFARLANE, J.

The opinion of the Supreme Court states the facts.

Decree for plaintiffs. Defendants, Edmond Englert, W. F. Hofmann, George Weil, J. W. Buchanan and P. N. Ramsey, appealed.

*Error assigned* was decree, as follows (quoting record):

And now, January 31, 1925, this cause came on to be heard, and it is ordered, adjudged and decreed that the defendants, P. N. Ramsey, Edmond Englert, W. F. Hofmann, George Weil, James D. White and J. W. Buchanan pay to Sarah E. McClenathen $2,000 with interest from November 26, 1921, to E. J. Sanders $500 with interest from January 25, 1922, to R. Lloyd Baily $2,000 with interest from February 28, 1922, to Eli G. Baily $2,000 with interest from February 28, 1922, to H. Hellan $1,200 with interest from March 14, 1922, to T. F. Biggins $1,000 with interest from March 28, 1922, to L. N. Burnett $1,000 with interest from April 3, 1922, to John F. Baily $1,000 with interest from May 12, 1922, and that the said defendants pay the costs.

*Ralph C. Davis* with him *C. William Campbell* for appellants.—Plaintiffs had no standing to maintain the bill: Wolf v. R. R., 195 Pa. 91; McCloskey v. Snowden, 212 Pa. 249.

The findings of the trial court are of a nonfeasance negligence, but no facts of negligence are set forth in the bill. Therefore, defendants could have no notice, and did not have any notice of the facts which are made an issue by the trial court: Modern Baking Co. v. Orringer, 271 Pa. 152.

There is no evidence of negligence of defendants as directors of the corporation: Hamilton v. Fay, 283 Pa. 175.

The measure of care required is ordinary and reasonable care, such as a reasonably prudent, careful and skillful man exercises in the conduct of his own affairs: Swentzel v. Bank, 147 Pa. 140; Loan Society v. Eaven-

son, 248 Pa. 407; Watts's App., 78 Pa. 370; Fell v. Pitts., 263 Pa. 314; Spering's App., 71 Pa. 11.

*Sidney J. Watts,* for appellees, cited, on the law of the case generally: Downey v. Finucane, 205 N. Y. 251; Cox v. Coal & Oil Invest. Co., 61 W. Va. 291; Old Dominion C. M. & S. Co. v. Bigelow, 203 Mass. 159; 30 Harvard Law Rev. 39.

OPINION BY MR. JUSTICE SIMPSON, March 15, 1926:

Those acquainted with the affairs of two adjacent, and financially weak, coal mining companies (hereinafter called the Amalgamated Company and the Cook's Mills Company), conceived the idea of getting a charter for a new corporation, of purchasing the assets of those two existing companies, and also properties adjoining them, and of so handling the matter as to tempt outside parties to supply sufficient money to make the purchases, and to furnish capital for the new concern. A charter for the new company was obtained, under the name of the Seaboard Coal Company, afterwards changed to the Seaboard Collieries Company (which, except when used in a quotation, is hereinafter called the Collieries Company), and the means adopted to induce others to invest, was by the sale of interim receipts in the following form: "This is to certify, that......is entitled to receive......Bonds of the Seaboard Collieries Company of the face value of......Dollars of the issue of Ten year, Seven Per Cent, Sinking Fund, General Mortgage, Gold Bonds, dated November 1, 1921, due November 1, 1931; principal and interest payable at the office of Fidelity Title and Trust Company of Pittsburgh, Pennsylvania, Trustees, without deduction for normal Federal Income Tax up to two per cent, and free of the Pennsylvania Four Mill Tax. In addition the holder hereof, free of cost, is entitled to receive......shares of the no-par Common Stock of the said Company. This Interim Receipt will be exchangeable for the engraved

bonds and stock certificates at the office of Fidelity Title and Trust Company, of Pittsburgh, Pennsylvania, upon notice to the holder hereof."

Those receipts were signed by Boyle and White, two of the defendants, who were officers of the Collieries Company, were first used long after November 1, 1921, the alleged date of the mortgage recited therein, and contained statements which were wholly false and untrue, but well calculated to deceive the investing public. In fact, the Seaboard Collieries Company never had any assets, save a small amount of personalty (and the money for which those false receipts were issued); it had never created or issued any bonds or mortgages; the Fidelity Title and Trust Company of Pittsburgh never was its trustee, and never agreed to allow either the principal or interest of any bonds to be paid at its office; and engraved bonds and stock certificates had never been printed or even authorized to be printed.

In addition to reciting the foregoing facts, plaintiffs' bill in equity averred that Boyle and White, at the direction and instigation of the other defendants, solicited money from plaintiffs, on the further representation that the Collieries Company was the owner of a large acreage of coal property; that plaintiffs, on the faith of this fact and of the statements contained in the interim receipts, paid the sums for which recovery was sought, and received such receipts therefor; that the seven defendants were officers and directors of said company, and received the moneys paid by plaintiffs, which in law "constituted trust funds which the Seaboard Collieries Company and the officers and directors thereof were obliged to hold in trust for plaintiffs until such time as said Seaboard Collieries Company should deliver, or direct to be delivered, to plaintiffs, bonds in the amounts and corresponding to the description called for in said interim receipts...... [but that the defendants] negligently permitted the money belonging in equity, as aforesaid, to plaintiffs, to be diverted and expended in

and about the corporate purposes and business of said Seaboard Collieries Company"; that said company afterwards became insolvent, and, without creating the mortgage, or issuing the bonds, conveyed all its assets to Ramsey, one of defendants, including therein a contract, made after the receipt of plaintiffs' money, for the purchase of certain coal lands from the Cook's Mills Company, Ramsey agreeing, in consideration of the conveyance, to assume "all the liabilities created by the sales of the bonds of the Seaboard Collieries Company." The bill prayed that the trust averred should be decreed to exist, that defendants should be declared to be trustees for plaintiffs of the moneys paid by the latter, and be ordered to repay those amounts, with interest.

Boyle, one of the defendants, did not answer, and a decree pro confesso was entered against him. The other defendants answered separately, admitting that plaintiffs paid the amounts specified in their bill, at the times named therein and in reliance on the statements made in the interim receipts, given to them; that the Collieries Company never created a mortgage or issued bonds; and that since the transfer to Ramsey, it was insolvent and had no assets. Each defendant denied, however, that he was personally guilty of any wrongdoing. All of them, except Ramsey, also admitted that, when the assets of the company were transferred to him, he agreed to pay to plaintiffs the amount of their subscriptions; he asserted he was to pay "only to the extent of the money received by him" from those assets. The court below found this fact against him. The final decree directed defendants to pay to plaintiffs severally, the amounts subscribed by them, with interest and costs. Separate appeals were taken by five of the defendants; Boyle and White, the other two, did not appeal.

The questions involved are said to be four in number. The first inquires whether the Collieries Company was not a necessary party to the suit. This point was first made in the exceptions filed to the adjudication, and

hence was presented at too late a date to be effective. Moreover, the company would not have been a proper party, much less a necessary one. Plaintiffs' cause of action is for a deceit practiced on them by defendants; hence the former alone are interested in the recovery, and only the latter are liable in damages. Under such circumstances, the corporation would not have been a proper party: Porter v. Healy, 244 Pa. 427; Beeber v. Wilson, 285 Pa. 312.

The second question said to be involved is "Whether any acts of negligence are set forth in the pleadings." This point was not made in the answers, or during the taking of testimony. Under such circumstances, we treat the pleadings as if amended (Ogden v. Belfield, 82 Pa. Superior Ct. 534), or, if an actual amendment is deemed best, we allow it to be made in this court: Hewitt v. Democratic Publishing Co., 271 Pa. 546. Here it is not necessary, the bill expressly averring that defendants *"negligently* permitted the money belonging in equity to plaintiffs" to be expended for other purposes. It is said, in appellants' brief, that they had no knowledge of what their supposed negligence consisted, until the findings of fact of the trial judge were filed, and that if they had previously been informed, they could have proved overwhelmingly the contrary of plaintiffs' allegations. The record tells a different tale regarding the date when they knew explicitly what was charged against them; but, if the fact had been otherwise, they should have asked the chancellor to reopen the case to enable them to produce such proof. This they did not do, but chose to proceed on the record as it had theretofore been made, planting themselves broadly on the simple proposition that plaintiffs had failed "to establish a case as alleged in the bill"; hence we cannot, as an appellate court, find the court below erred in not doing what it was not asked to do; furthermore, no assignment of error complains of this.

The third question said to be involved, inquires whether plaintiffs' damages were caused by any acts of the defendants. That they suffered damages, in the loss of their money, is clear, and was not disputed below. So far as relates to the responsibility of defendants, a like inquiry is made in the fourth question, viz: "Whether there is any evidence of negligence of defendants as directors of the corporation?" In answering this point, it will be noticed (and this is also true of appellants' requests in the court below, and of their brief in this court), that it does not challenge the right of plaintiffs to recover, upon the legal theory set forth in the bill, against such of the defendants, if any, as negligently dissipated the money which plaintiffs had contributed for the purchase of the bonds described in the interim receipts. On the contrary, we are only asked thereby to decide a single issue of fact as to each defendant, viz: Is there any evidence showing he was guilty of negligence as director? Defendants are not in position, however, to urge the point upon us, for they have wholly disregarded the rules of this court.

Rule 53 provides, inter alia, that "When the finding of, or the refusal to find, a fact is argued, the printed brief of argument *must* contain a synopsis of all the evidence on the point, with a reference to the page or pages of the record where the evidence may be found." This rule has been entirely ignored by appellants, and, because thereof, Rule 57 states the appeals may be quashed. The brief contains no synopsis of the pertinent evidence, and does not refer to the pages in the record where the evidence, supposed to dispute the findings, may be found. It does not even aver there was no evidence to sustain the findings; but appellants content themselves with asserting the absence of proof regarding things not found and matters admitted in the answers. Instead of applying the drastic punishment authorized by Rule 57, however, we have concluded to decide the exact question we are asked to determine, that is, to as-

certain whether there is *"any* evidence" of defendants' negligence.  In doing this, we must, of course, give full effect to all the evidence favorable to plaintiffs (except such as the chancellor refused to believe), and all in-ferences in their favor which may fairly be deduced therefrom, for only thus can we determine whether or not there is *"any* evidence" of defendants' negligence.  From the facts as thus found to exist, from the admis-sions in the answers, and from the findings of the trial judge, we will now proceed to answer the question thus suggested by defendants.

As to the appellant in No. 86, March Term, 1925, the findings of the court below are that "Buchanan, [this appellant] after his election as director and vice-presi-dent, attended no meetings, and did not examine into the sources of the money which he knew the company was expending.  He had knowledge that there were no other sources of revenue than from the sale of bonds, and actual knowledge of the payments required by the Cook's Mills contract [for the sale of its property to the Seaboard Collieries Company], which had been executed by him as president of [the former] company.  He gave no excuse or reason for nonattendance, and for nonper-formance of any duty as director.  He was negligent to the injury of plaintiffs."  It will be observed that the alleged liability of Buchanan is thus based solely on the fact that he failed or refused to act as director and vice-president of the Collieries Company, and hence is re-sponsible for the negligence of those who did so act.  We know of no principle of law which justifies such a con-clusion.  He was not legally required to formally decline to accept his election as director, and his failure in that respect, would not result in liability for the wrongful expenditure of plaintiffs' money, by those who were act-ing in that capacity.  His appeal must be sustained.

The cases of Englert, Hofmann, Weil and Ramsey, the other four appellants, may be considered together, any differences of fact regarding them being immaterial on

the question of their liability. The Collieries Company was chartered on December 17, 1921, defendants, so far as appears, being the only ones who were ever stockholders of it. It was formed for the purpose of taking over the assets of the Amalgamated Company, in which Englert was interested and for which he was counsel, and of the Cook's Mills Company, in which Weil and Hofmann were interested, and for which Weil was counsel. The plan adopted for financing the Collieries Company, was by the sale of the interim receipts, above quoted, and was agreed upon about the time of incorporation. They were prepared in the office of Mr. Englert, who was acting as counsel for the company, and said it was proper to issue them, he being anxious, as one witness testified, to get some of the money for use in tiding over the difficulties of the Amalgamated Company, in which he was interested. All of these appellants knew of the fact that there was no other way of raising the money; of the subscriptions and payments made by plaintiffs; and of the dissipation of the funds thus raised; yet they made no attempt to prevent the use of those fraudulent receipts to obtain money, or to preserve it intact, when obtained, until property was bought and mortgaged, and bonds, secured by the mortgage, were given to plaintiffs. On February 8, 1922, two written agreements were made. One was the Cook's Mills contract, already referred to, and, on account of it, $16,700 was subsequently paid to Weil, for that company, but title to the property was never made to the Collieries Company, because it failed to make the payments provided for. The other agreement was between the Collieries Company (though its consent had not then been obtained) and Boyle, White and Englert, and was prepared by Englert. By it, Boyle was to get $500,000 worth of first mortgage bonds of the company, at 75 per cent of their par value; White was to get 17,500 shares of the no-par stock of the company, in lieu of future royalties on certain machinery patented by

him; and Englert was to get 5,000 shares of the same stock, in consideration of eight months' legal services to be rendered to it, whether many or few; and White and Englert were each given the right to vote 5,000 of his shares at any time he desired. In the same agreement Boyle covenanted to sell each month not less than $30,000 face value of the imaginary issue of bonds for which plaintiffs subscribed, and which, as already stated, had never been authorized, nor had the mortgage which was supposed to secure them; yet Boyle, White and Englert bargained for a sale of $30,000 of these worthless securities in order that the Collieries Company, in which they thus became largely interested, might profit thereby, if matters turned out favorably. The Collieries Company entered into possession of the property agreed to be purchased under the Cook's Mills contract, White being the manager thereof, and Boyle and Ramsey attending to the financial end of the matter. In preparing to operate the mine, and in payments on account of its proposed purchase, all of plaintiffs' money was expended, the last thereof between the dates hereinafter specified. The court below found that Englert, Weil and Hofmann also knew of these matters, and at least tacitly consented thereto, thus making themselves responsible for that which was done by White, Boyle and Ramsey. On May 9, 1922, what is called the "first meeting" of the directors was held, Englert, Hofmann and Weil signing a waiver of the requirement as to the length of time for which notice thereof was prescribed. At that date, when there was a sum of money on hand nearly sufficient to pay plaintiffs in full, Englert, who had theretofore been counsel only, was elected a director also; Weil, Hofmann and Ramsey had been previously elected on February 18, 1922, but Weil and Hofmann did not serve until this meeting. The two written agreements, above referred to, were ratified and approved at that time, these appellants voting in favor of them. No objection was then made by them to the continuance of

White's futile attempts to operate the mine, by the use of plaintiffs' money, though they could have stopped it at once; nor did they thereafter object to what he did, until the meeting of the board, on June 8, 1922, when the whole of the money had been expended. At that meeting, which was attended by all these appellants, disputes and angry recriminations arose among the directors, who then, for the first time, resolved that no further sales should be made of the bonds (thus showing they knew sales had been made); by resolution they also directed that all the remaining assets of the company should be transferred to Ramsey; and then resigned as officers and directors, leaving the company with neither officials nor assets. As this made it impossible for plaintiffs to get either the bonds specified in the interim receipts, or a refund of the money they had paid for the bonds, they filed the present bill in equity to obtain reparation for the wrongs done to them.

If a jury, on the facts thus stated, had found against these appellants, we could not properly have reversed that finding on the ground that there was no "evidence of negligence of defendants as directors" of the Collieries Company; a fortiori we cannot where the chancellor, who saw and heard the witnesses, has so found and the court in banc has sustained his conclusion: New York & Penna. Co. v. New York Central R. R. Co., 280 Pa. 297. Indeed, it is difficult, if not impossible, to read the evidence and not conclude that the parties were playing for big stakes, which they were afraid they would lose if they stopped operating the mine; hence the finding that they were guilty of negligence only, certainly was not dealing harshly with them. If their actions did not constitute bad faith towards plaintiffs, they were dangerously near to it. Whether or not defendants were promoters of the corporation (and there is abundant authority to show that they were: 6 Words and Phrases, 5682; 3 Ibid., 2d series, 1263), they were certainly promoters of their own interests at the expense

of plaintiffs; whereas, in the position they occupied, they should have jealously guarded plaintiffs' rights. It is of no moment that these particular appellants did not expend the money personally; they knew it was being expended by one who was subject to their control, and yet permitted this to continue until there was no more money to expend.

On the appeals of Edmond Englert, W. F. Hofmann, George Weil and P. N. Ramsey the decree of the court below is affirmed and the appeals are dismissed at their costs. On the appeal of J. W. Buchanan the decree is reversed, and the bill in equity is dismissed, at the cost of appellees.