**CHRIS–CRAFT INDUSTRIES, INC.,**
**Plaintiff,**

v.

**PIPER AIRCRAFT CORPORATION**
**et al., Defendants.**

**No. 69 Civ. 2227 (MP).**

United States District Court,
S. D. New York.

Nov. 6, 1974.

As Amended Nov. 12, 1974.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for plaintiff; Arthur L. Liman, Jack C. Auspitz, Anthony M. Radice, and Richard A. Miller, New York City, of counsel.

Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, for defendants (Bangor Punta Corporation, David W. Wallace and Nicholas M. Salgo); James V. Ryan, C. Kenneth Shank, Jr., and Robert A. Kandel, New Yory City, of counsel.

Sullivan & Cromwell, New York City, for defendant (The First Boston Corp.); J. F. Arning, C. W. Sullivan, and R. Urowsky, New York City, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendants (Piper Aircraft Corporation, Howard Piper, Thomas F. Piper and William T. Piper, Jr.); Zachary Shimer, New York City, of counsel.

POLLACK, District Judge.

This case is on remand from the Court of Appeals to determine the quantum of compensatory damages due to Chris-Craft Industries, Inc. (CCI or CC herein) from the defendants who were not dismissed from this suit and to include in the judgment an injunctive provision barring Bangor Punta Corporation (BPC or BP herein) from voting for a period of at least 5 years the Piper shares it obtained through purchases for cash and by an exchange offer which did not comply with the securities laws.[1]

Briefly, the Court of Appeals held herein that where a successful contend-

---

1. The original order of the Court of Appeals found defendants Paul L. Miller and Nicholas H. Bayard liable to CC. On rehearing, this determination was withdrawn and the Court of Appeals left it to the District Court to determine from the record whether, under the principles of liability regarding First Boston and its officers announced in the opinion on the appeal, either of said defendants was individually liable. The plaintiff then stipulated in the District Court that the complaint against them should be dismissed and it was so ordered.

er for control of a target corporation has attained part of its majority of the voting shares of the target corporation by purchases made in violation of the securities laws, the defeated contestant for control, although it neither purchased any securities from its competitor nor was deceived by any acts or statements of the latter, was entitled to sue the winner for damages as may be shown, measured by the reduction, if any, in the appraisal value of its shares of the target corporation when its opponent's position as a majority owner became established.

The right to sue and to claim such damages was accorded to encourage and implement the enforcement of the securities laws through private litigation and to deny to a securities law violator the fruits of obtaining shares of stock illegally, even though the unsuccessful contender was not induced by its competitor to enter the contest or to become a purchaser of the shares of the target corporation. The harm done to the defeated contestant according to the Court of Appeals is not that it had to pay more for the stock it bought but that it obtained less stock than it needed for control—and this irrespective of whether it be shown that it could in fact have obtained control if there had been no interference with its opportunity.

Twice in the main opinion on appeal, it was clearly stated that, although there was an interference with CC's opportunity to obtain control, CC failed to establish that it could otherwise have succeeded in obtaining enough shares to give it control.[2]

We agree with the district court's finding that CCI failed to show with reasonable certainty that it would have obtained a controlling position in Piper had it not been for the violations of the securities laws by BPC and First Boston. 480 F.2d 341, at 373.

We cannot say that CCI would have obtained a majority of Piper stock had BPC not violated the law, . . . 480 F.2d at 378–379.

The Court of Appeals pointed out that "the questions presented are of first inpression", 480 F.2d 379, and as a moment's reflection will show, in ascertaining the damages called for, the appraisal mandated by the Court of Appeals requires the use of hypothetical figures and values. The parties constructed and theorized such figures and values from circumspectly selected data to supply their damage estimate contentions. Not surprisingly, each side charges the other's expert witnesses with internal factual inconsistencies. The Court, in a sense, agrees in the main with both parties.

The Court of Appeals set forth the damage issue for this Court as follows:

The measure of damages should be the reduction in the appraisal value of CCI's Piper holdings attributable to BPC's taking a majority position and reducing CCI to a minority position, and thus being able to compel a merger at any time. 480 F.2d at 380.

■ Controversy produced by the mandate has arisen in part from perplexity in grasping its concept and forging a rational method of application. The words used are capable of a variety of interpretations and shadings, as the parties have demonstrated in their respective briefs, and they have put this Court to the difficult choice between following the strict literal meaning of the words and the broader remedial intent evidenced by the general thrust of

2. The concurring opinion of Judge Mansfield points out that early in the control contest, CCI had run out of money and due to a restrictive agreement in effect with its senior noteholders and the prohibitive cost of borrowing additional funds, CC's chances of obtaining loan financing to pick up more of Piper's stock "were negligible" (p. 402) "In summary, having 'shot its bolt' in the financial sense by early February 1969 CCI was thereafter relegated in its quest for control of Piper to the use of exchange offers. It was in no position to purchase for cash any appreciable amount of Piper shares over and above the 304,606 tendered in response to its initial cash offer". 480 F.2d at 402.

the appellate decision. The task of reconciling the often conflicting results stemming from each course, has in turn produced as many complexities as it has clarified. Additionally, the quantification of unliquidated damages is hardly an exact science; computation thereof is accomplished basically by estimation and inference. *See generally* Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Columbia Pictures Industries, Inc. v. American Broadcasting Companies, Inc., 501 F.2d 894 at 898 (2d Cir. 1974); Crane Co. v. American Standard, Inc., 490 F.2d 332, 343 (2d Cir. 1973) (damage computations "demand prodigies of prophecy and measurement beyond the capacity of jurors and perhaps of a judge").

The damage inquiry herein, naturally enough, called for expert testimony to assist in the evaluation of the manner and extent to which CC had been damaged by the violations established. The parties took many months to prepare for the hearing on damages. The selection and preparation of their experts was obviously carefully orchestrated; indeed, it would be naive to assume that the experts were selected and proceeded without regard to the interests of the party who called them. Rather, the record clearly reflects that by and large the experts were result-oriented, a fact which tended to restrict their contribution to something less than a full view of the damage problem and to make their results fall short of meeting the full scope of the real questions to be decided.

As a general concept, both parties agree that CC's damages must be measured by comparing the value of its Piper holdings prior and subsequent to BP's acquisition of majority ownership. The disagreement surfaces, however, in the differing paths which the parties take in reaching a valuation.

Preliminarily, there is a deep dispute over the base from which the CC ownership is to be valued for the damage inquiry. BP suggests that no injury occurred until the moment immediately preceding its acquisition of majority ownership. CC, however, argues that its Piper stock should be valued as if CC was the owner of 41%, and BP owned 31% of Piper.[3]

Neither BP nor CC, however, have fully addressed the purpose of the mandate in their analysis of the inquiry before the Court. The Court of Appeals' determination that BP unlawfully purchased 14% of the Piper shares suggests that the 14% must be effectively "discarded" by BP; indeed, the injunction ordered by the Court of Appeals is aimed at effectively freezing the voting of that stock for a significant period. Without that 14%, BP would have owned but 37% on September 5, the date it gained a majority. CC, meanwhile, would have held at least 42%, the amount it in fact ended up with on that date. Since the inquiry here is to determine the damage suffered by CC *attributable to BP*, it is therefore appropriate to determine what the value of CC's block of stock *would have been worth* on September 5[4] *absent* BP's illegal conduct, i. e., if CC on that date had led in the contest 42% to 37%. In turn it must be determined how that value was affected by BP's taking a majority position and reducing CC to a minority position.

The methodology of that quantification is by no means simple. The Court of Appeals directed this Court to meas-

---

3. On August 7, 1969, BP owned 45% of Piper and CC owned 41%. BP had acquired 14% of its stock unlawfully; thus, discarding that 14%, CC would have "led" 41% to 31% on August 7.

4. Initially, the parties hotly contested the relevant date to be used for the valuation inquiry. CC initially contended that the Piper stock should be valued as of August 7, 1969. However, in its post-hearing memorandum, CC has abandoned that argument and has joined with BP in adopting the September 5 date for valuation purposes. The crucial question of the methodology to be used, however, remains unchanged.

ure the "reduction" in the "appraisal value" of CC's Piper holdings attributable to BP's unlawful conduct. BP, therefore, insisting that the instructions must be literally followed, would have this Court consider BP's merger power and look only at whether there was any reduction in the appraisal value of the Piper stock in the context of a statutory appraisal proceeding, i. e., the amount that a Court would have awarded a Piper stockholder in a statutory appraisal proceeding on September 5, 1969.

CC, on the other hand, argues that BP's literal interpretation of the mandate and any use of the concepts of a statutory appraisal would render the Court of Appeals' decision nugatory. CC argues that BP's interpretation would erase any difference in the statutory appraisal value of the Piper shares measured on September 5 just prior and then subsequent to BP's gaining majority ownership.

■ CC's reading would jettison the measured phrasing of the Court of Appeals' mandate. It must be presumed that the talisman, "appraisal value", was chosen purposefully. The words so used must be viewed in the legal context in which they appear in the mandate. The Court of Appeals associated the reduction of the appraisal value to be found with BP's "being able to compel a merger at any time." [5]

■ If the word "appraisal" is to be considered in its more colloquial mean-

ing, i. e. "to fix a price . . . as an official value" (Oxford English Dictionary, 3d Ed. 1965), the phrase "appraisal value" would be redundant. To be sure, the Pennsylvania appraisal statute eschews the term "appraisal value" in favor of the words "fair value"; nonetheless, the Pennsylvania cases, as well as the common legal usage in this Circuit and elsewhere, clearly acknowledge the significance of the term "appraisal value" (in the context of merger) as referring solely to statutory proceedings, see Lowry v. General Waterworks Corp., 26 Pa.D. & C.2d 154 (1963); Petition of Kreher, 379 Pa. 313, 108 A.2d 708 (1954). See also Miller v. Steinbach, 268 F.Supp. 255 (S.D.N.Y.1967) (applying Pennsylvania law). That CC could not have been forced by BP's voting power alone into such an appraisal proceeding while CC hypothetically held a five-percentage-point lead over BP is of no moment. For reasons best known to it, the Court of Appeals has directed this Court to determine the "appraisal value" of CC's Piper holdings as if keyed to such a proceeding, viz., being able to compel a merger.

■ BP, however, has not convinced the Court with its argument that there was no "reduction" in the appraisal value of CC's Piper holdings. Other considerations could well come into play which might involve advantages from which CC was foreclosed.[6]

5. It is basic corporate law that statutory appraisal proceedings, when available, can be invoked by dissenters who object to mergers of the corporate enterprise. Such is the law of Pennsylvania, the law which applies herein. See 15 Pa.Stat.Ann. § 1908 (Purdon's, 1967).

6. It is not at all clear that the Court of Appeals considered the effect of cumulative voting on Piper's even-man Board of Directors. In fact, when the Board stood at eight directors—as it did in September of 1969—BP, as a majority owner, was entitled to but four of the directors, CC three, and the public retained the balance of power. Possession of a mathematical majority of the outstanding shares gives the illusion that the majority will

also be able to elect a majority of the directors. However, where, as here, there is cumulative voting and an even-numbered Board of Directors, it takes more than a bare majority to elect more than half of the Board. Thus, as the Piper Board stood in 1969, BP by no means instantaneously achieved the absolute power to compel a merger "at any time" when it obtained 51% of the Piper shares, since it was at that point assured of only half of the directorships, and Board approval would have been necessary under Pennsylvania law for any merger plan. See 15 Pa.Stat.Ann. § 1902 (Purdon's 1967). To be sure, as plaintiff seems belatedly to have recognized, as a majority stockholder BP could have used its voting power at a stockholders' meeting to

Prior to the time that BP gained majority ownership, CC clearly possessed at least the opportunity to itself gain control of Piper, and this opportunity was erased once BP emerged as the holder of a majority of the Piper shares on September 5. Thus, at the moment that CC was confined to its minority ownership status, the "appraisal value" of its Piper shares was possibly reduced because of the removal of CC's opportunity to gain control of Piper and would have to be discounted to reflect the uncertainty of its position due to its dependence in some respects on BP's future conduct. CC contends that BP could be expected to choose the bottom of a business cycle to merge and force CC to seek its appraisal rights then under Pennsylvania law.[7]

Quantifying that reduction in present value, however, is well-nigh an impossible task. It is one thing to recognize in the abstract that there has been a "reduction", but quite another to assign a value to that concept. No one can guess when, or even if, BP would ever force CC to submit to or seek a statutory appraisal or predict in what presently unforeseeable way BP might legitimately turn control to its advantage and CC's disadvantage. Indeed, the injunction ordered by the Court of Appeals expressly obviates that possibility for at least five years. BP's "power" to compel a merger is, standing alone, too speculative to quantify. It is highly doubtful that the Court of Appeals intended that this Court should engage in such conjecture. The more logical inference is that this Court should on the basis of good sense as applied to the record reach an appraisal decision making the best estimate possible under the circumstances of what "reduction" in "appraisal value" occurred.

Thus, this Court must find a value for CC's Piper holdings both before and after BP gained majority ownership. Obviously, the objective components of that value, as recognized by the experts—such as asset value, and market value—remained unchanged in BP's gaining a majority. The relevant block for purposes of such an evaluation is merely an anonymous 100-share block, and each of the experts so proceeded. The "value" of such a block was not altered by BP's unlawful conduct. Consequently, the only issue for determination is what *premium* CC's block would have commanded that disappeared once BP took "control". CC is presently in a position no different from that of any minority owner (albeit a large one) of any publicly held corporation. Only that premium representing the value of CC's opportunity to gain control has been removed. Thus, it is the removal of that premium which represents the reduction in value of CC's Piper holdings attributable to BP's acquisition of majority ownership.

---

alter the by-laws and change the number of the Board of Directors, thereby gaining the mathematical opportunity to elect a majority of the Board. Such an effort in these circumstances would surely have been highly suspect and might well have raised thorny questions for litigation; in any case, the ability to so alter the Board hardly is akin to the Court of Appeals' determination that BP gained the power to force a merger "at any time". *Non constat*, for present purposes this Court will assume that BP did in fact acquire that merger power on September 5, 1969, heeding the oft-repeated rule that the District Court must follow the mandate of the Court of Appeals however erroneous the lower Court may deem that mandate to be. Crane Co. v. American Standard, Inc., 490 F.2d 332, 341 (2d Cir. 1973).

7. It is unclear as a matter of practical finance whether BP would in fact choose such a time for merger. At the bottom of a business cycle and in a period of contraction, BP (and thus Piper) would clearly have limited resources or at least limited economic incentives to fund an appraisal award; CC's huge minority block, by any standard, would sport a heavy price tag to be borne by BP in such a proceeding. Moreover, as markets rise, the cash cost of satisfying an appraisal demand might well increase greatly without a corresponding increase in available cash to fund the payout, thus chilling any prospect of merger in such circumstances.

*The value of the plurality position*

The determination of the value of CC's hypothetical "lead" of 42% to 37% (and hence the value of CC's lost opportunity to gain control) must be preceded by an estimate of the fair market value of the Piper stock on September 5, 1969. For it is elementary that whatever premium CC's stock contained expressive of its lead position and its opportunity therewith to gain control must be added to the fair market value of its holding in Piper stock on that date.[8] Once the fair market value is determined, the value of CC's opportunity to gain control can be evaluated by determining the value of actual possession of control of Piper to CC. That value will be a figure that must be discounted by the factors of probability of success, time, and the economic benefit of that control to CC's holdings.

*I. Fair Market Value*

The "fair market value" of Piper which must be determined is that market value of Piper uninfluenced by the fight for control.[9]

Each of the experts attempted to formulate the fair market value of the Piper stock as of September 5. Their somewhat surprisingly narrow range of disagreement highlights the relative acceptability and uniformity of their techniques and methodologies with respect to estimating a fair market value.[10]

The relevant testimony as to "fair market value" can be summarized as follows:

■ Dr. Sigmund Wahrsager, testifying for CC, determined that the fair market value of the Piper shares on September 5, 1969 would have been $52 per share. Wahrsager is a partner in the Wall Street firm of Bear, Stearns & Co. responsible for the activities of the corporate finance department, which deals with public offerings, private placements, mergers and acquisitions, tenders and evaluation of securities. Wahrsager's testimony as to fair market value reflected utilization of the same technique used by all the experts, *viz.*, to apply a selected price-earnings multiple to Piper's earnings during the period considered. Such a computation has long been recognized as an accepted technique in determining fair market value. *See, e. g.*, Morris v. Burchard, 373 F.Supp. 373 (S.D.N.Y.1974); Vandervelde v. Put and Call Brokers, 344 F.Supp. 118, 150–151 (S.D.N.Y.1972). *See generally* Dewing, The Financial Policy of Corporations 390–391 (5th Ed. 1953).

8. The amounts paid by the contestants in the midst of the battle are by no means the sole or even a fair indication of the premium relevant herein. The conduct of contestants in such battles is often marked by "irrationality" (Tr. 500–24); no expert testified that the Piper investment was worth anything approaching the $80 per share paid by the parties. The amounts paid were clearly wildly and artificially inflated due to the emotional, as well as actual, struggle of the parties. Such amounts, therefore, must be discarded for purposes of determining *fair* market value.

9. This does not mean that Piper's so-called attractiveness as a "conglomerate target" (alluded to by Prof. Roger Murray, one of the plaintiff's experts, and adopted extemporaneously on the witness stand by another of plaintiff's experts, Robert Rosenkranz) should be ignored. The "fair market value" does no more than remove the distorted, artificially inflated prices that were being paid by the contestants. To the extent that Piper, stand-

ing alone, held any "attractiveness" as a target, that "attractiveness" would be represented in its fair market value notwithstanding the presence or absence of a hotly contested fight for control.

10. At the first trial, plaintiff's expert was Dr. Douglas Bellemore, a Professor at a graduate school of Business Administration. Bellemore never addressed the question of fair market value in his testimony; moreover, what theories he did utilize were, together with their results, wholly out of line with all of the other experts produced by both parties. Indeed, this Court's earlier characterization of Bellemore's testimony as "unsubstantiated and cursory" (337 F.Supp. 1128, at 1153, n. 11) seems now to have been adopted *sub silentio* by his proponent, the plaintiff, which has now abandoned any reliance on the Bellemore testimony. For practical purposes, the Bellemore testimony can be discarded for this inquiry.

Professor Roger Murray, a professor of finance at Columbia University's Business School with a long list of financial credits, another of CC's experts, was somewhat more oblique in his approach. His "fair market value" computation reflected a built-in premium value for CC's lead position. However, stripped of its semantics, Murray concluded that the Piper stock, absent the control fight, would have been valued at $36.75 per share—by far the lowest figure offered by any of the experts.

Plaintiff's remaining expert, Robert Rosenkranz, carrying responsibilities in the corporate finance area, had introduced the Chris-Craft account to his firm, Messrs. Oppenheimer & Co., after the events complained of herein.

The firm became financial adviser to CC in connection with a recapitalization plan. His and their interest are to be considered in evaluating his testimony. Rosenkranz testified that the Piper stock had a fair market value of $58 in September of 1969.[11]

At the initial trial, defendant's sole expert was Clifford Fitzgerald, vice-president and head of the Corporate Finance Department of Drexel Firestone, Inc. He testified extensively on the subject of the fair market value, the value of control, its elements, how to estimate a premium for control, and the appraisal value of Piper stock. In this Court's earlier opinion, Fitzgerald's testimony was characterized as "careful and well-documented" and "persuasive in the main". 337 F.Supp. at 1153, n. 11. Fitzgerald had testified at that trial that the Piper stock's fair market value was $42.10 per share on September 5, 1969 and he explained in detail how this was arrived at. Each of the experts at

the post-trial hearing on damages referred particularly to Fitzgerald's testimony, attempting to harmonize or compare their conclusions with Fitzgerald's. Their reliance on the Fitzgerald analysis in ascertaining fair market value—which utilized the same basic formula of earnings multiplied by an appropriate capitalization rate—reinforces this Court's previous impression of the reliability of Fitzgerald's conclusions.

At the post-trial hearing on damages, defendants presented the record of the Fitzgerald testimony and two additional expert witnesses. The first, Aubrey Lank, is a Delaware lawyer with experience as a Court-appointed appraiser, expert witness and attorney in statutory appraisal proceedings under Delaware law. Lank quantified defendants' statutory appraisal theory of damages. He also computed Piper's fair market value in September 1969 as one element of the appraisal process; his analysis resulted in a fair market value of $52.50 per share and an appraisal value of $49.46.

Defendants' second hearing expert was Donald Gant, a partner of Goldman, Sachs & Co., whose function for 20 years has been to give advice in corporate financing, to carry out public underwritings, private financings, mergers and acquisitions and to do evaluations of securities. While Gant's preparation for the hearing was concentrated on the price CC would have realized from a public distribution of its Piper stock, he also computed the fair market value of the Piper stock on the relevant date at between $44 and $46 per share. Gant's oral testimony further reflected the pragmatic business realities facing a contestant engaged in the titanic struggle portrayed in this case; his

11. In addition, plaintiff on rebuttal produced an unscheduled witness, Mr. Steven Ross, Chairman of Warner Communications, Inc. Ross was presented as a man with business experience in corporate acquisitions, and thus qualified as an "expert" to testify at the hearing. No prior notice was given to defendants of Ross' appearance, depite some months of preparation for expert testimony and agreement between the parties to disclose to each other the identity and opinions of all experts to be used. Ross is a long-time client of plaintiff's counsel in the field of corporate acquisitions and thus his availability must have been known and anticipated for some time. Ross' testimony was confined to the area of his alleged "expertise"; he voiced no opinion as to the value, fair or otherwise, of Piper other than to announce his faith in Nicholas Salgo's (the Chairman of Bangor Punta) judgment.

analysis utilized realistic financial appraisals rather than abstract academic or statistical notions.

Thus, the figures on fair market value ranged from Murray's strikingly low estimate of $36.75 to Rosenkranz's $58 per share—a spread of some $20 per share. Ignoring the two extremes, however, the spread is reduced considerably, i. e., to $10 per share (from Fitzgerald's $42.10 to Lank's $52.50).

Selecting the appropriate figure involves, obviously, a certain amount of balancing and estimation. As noted, all the experts followed the pattern of reconstructing what each considered to be the appropriate earnings figure for Piper and then applying a "multiplier" to represent the price/earnings ratio. To derive the proper factor, some experts utilized information relative to Piper's competitors, Cessna and Beech; others gave more weight to the Standard & Poor's general average; and still others relied mainly on Piper's own past performance. Thereafter, each expert took a separate route to his ultimate figure.

■ Choosing one expert's figure over another on this issue would be to reject one accepted technique while accepting the other. The more prudent course would simply be to average all the computations, an approach advocated by defendants in their post-trial memorandum. *See also* Note, Developments in the Law-Damages, 61 Harv.L.Rev. 113, 125 (1947). Averaging all the experts yields a fair market value figure of $47.73; discarding the highest and lowest figures and averaging the rest results in a value of $47.90. Thus, under all the facts and circumstances, a round figure of $48. per share seems a reasonable and justifiable estimate of the fair market value per share of Piper stock as of September 5, 1969.

## II. The Value of Chris-Craft's Opportunity to Gain Control

Quantifying the premium, if any, representing the value of CC's opportunity to gain control of Piper while holding a hypothetical 42% to 37% "lead" entails, of necessity, a determination of the value of ultimate control of Piper to CC.

"The phenomenon of 'control' is perhaps the most important single fact in the American corporate System." Berle, " 'Control' in Corporate Law", 58 Columbia L.Rev. 1212 (1958). Control has been referred to by one commentator as "the complexus of duties and rights possessed by the custodian of another's goods." Bayne, "A Philosophy of Corporate Control", 112 U.Pa.L.Rev. 22, 29 (1963). The law has never "advertently" defined control in a manner that allows one to reduce it to a money value. (Ibid.) The securities laws refer redundantly to the power to exercise a controlling influence. Despite the amorphous intangible nature of "control", both parties have argued their positions as if they are assuming that "control" is *ipso facto* a valuable personal asset that can be bought and—more importantly—sold or otherwise converted into actual financial gain by its "owner". The control position, however, cannot be viewed so narrowly.

■ To be sure, private parties have long paid substantial premiums for control positions, and each of the experts who testified before the Court so acknowledged.[12] However, the "value" of having control is not necessarily the price paid in excess of the fair market value of the stock purchased. Control represents different values to different holders. The value of control is, if nothing else, subjective; indeed, "[c]ontrol may be sought for a combination of reasons, some of them so subjective that the buyers may themselves be uncertain regarding their basic intentions." Hill, "The Sale of Controlling Shares", 70 Harv.L.Rev. 986, 1010 (1957). Plaintiff's witness Steven Ross added a literary touch by saying "control gives power over your own destiny" (Tr. 612); but the *value* of this

---

12. "[A] controlling block of stock has greater sale value than a small lot." Perlman v. Feld-mann, 219 F.2d 173, 180 (2d Cir. 1955) (Swan, J., dissenting).

"power" still lies in the realm of subjective judgment (Tr. 631). Perhaps most importantly, the value of control varies with the purposes to which control will be put. *See generally* Bayne, "The Investment Value of Control Stock", 54 Minn.L.Rev. 1265 (1970). Examples of this differing subjective value of control are easily imagined. Thus, for instance, control of a motor company might be worth far more to another motor company than it would be to a large bank; a motor company might be able immediately to integrate the "target's" operations, and apply its own marketing and management expertise to its acquisition. The bank, on the other hand, would have to expend further substantial sums in acquiring this expertise—either from inside the company or from without—and thus make a much larger investment in the motor company to be acquired. The larger the cost of the investment necessary, assuming a constant return under optimum conditions, the smaller the percentage of that return on the investment, and hence the lower the value of control.

■ Control, furthermore, has a variety of other measurable values, ranging from the crucially important to the banally mundane. Thus, for example, control carries with it the ability to appoint officials and dictate managerial policy. *See, e. g.,* McClure v. Law, 161 N.Y. 78, 55 N.E. 388 (1899); Honigman v. Green Giant Co., 309 F.2d 667 (8th Cir. 1962). Other advantages of control include the opportunity to liquidate the company, to secure a capital gain, arrange mergers (as recognized in the instant case by the Court of Appeals) and consolidations advantageous to the controlling persons' outside interests, to cut or eliminate dividends to avoid personal income taxes, to grant stock options, and the like. Bayne, "A Philosophy of Corporate Control", 112 U.Pa. L.Rev. 22, 52, n. 103 (1963). In short:

> The corporate assets at control's disposal for the performance of managerial duties range from the picayune perquisites of the office—yachts, clubs, secretaries, and chauffeurs—to the determination of important policies of purchase and sale, of initiation of litigation and declaration of dividends. *Id.* at 49.

Defendant's expert Fitzgerald, testifying at the initial trial, accurately surveyed the elements in valuing control, noting that the holder could derive the benefits of equity financial reporting, the ability to direct the business and its policies, the ability to merge or sell assets, declare dividends, sell stock, obtain counter-seasonal or counter-cyclical effects and the prospects of an enhancement in a price/earnings ratio of the acquirer. (Trial Tr. 1536–42.)[13]

■ But it is equally clear that the controlling person may not baldly misappropriate this power for his own interests at the expense of the corporation; his primary responsibility is to the corporation itself, for the controlling party is merely a custodian of the powers of his office. *Cf.* Porter v. Healy, 244 Pa. 427, 91 A. 428 (1914); Commonwealth Title Ins. & Trust Co. v. Seltzer, 227 Pa. 410, 76 A. 77 (1910).[14] And unless that custodian can somehow convert that control, and thus enhance the value of his investment through utilization of the control position, that position is—standing alone—not worth any premium. *See* Bayne, "The Investment Value of Control Stock", 54 Minn.L.Rev. 1265, 1281–88 (1970).

In the case presently before the Court, it is not at all clear that CC entered the

13. To be sure Fitzgerald concluded that none of these elements gave any added value to the control position in this particular case, *see infra* pp. 43–4.

14. "The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors." Southern Pacific Co. v. Bogert, 250 U.S. 483, 487–488, 39 S.Ct. 533, 535, 63 L.Ed. 1099 (1919). *See also* Berle " 'Control' in Corporate Law", 58 Columbia L.Rev. 1212, 1222–4 (1958).

contest to gain control of Piper and it is even less apparent that CC could have enhanced its investment by gaining control. The timing of CC's entrance into the marketplace in search of Piper stock, as well as the other evidence adduced both at the initial trial and on the hearing on damages strongly suggest that CC desired and speculated for only a profitable take-out of its Piper investment. Its commitment to seeking long term investment in and control of Piper came later, under compulsion.

Thus, for example, CC's January tender offer was for only 300,000 shares, at a time when it was manifest that CC needed approximately 500,000 shares for control of Piper. CC's former Vice President, C. Leonard Gordon, stated at the initial trial that CC did not want to give the impression that it was committing itself to acquire a majority of the stock because it was not in fact committing itself; that its intention in making this limited tender offer was precisely "to be in a position to sell", "if we could see it was advantageous to get out or necessary to do so"; CC had not arranged for financing necessary to go for control. CC's "Schedule 13", filed with the Securities and Exchange Commission in compliance with the terms of the Williams Act regulating tender offers, 15 U.S.C. § 78n(d–f), while stating that CC was seeking to acquire the Piper shares with a "view" towards control of Piper—used language calculated to leave CC with the option of selling out, according to Gordon (Trial Tr. 372).[15]

More generally, CC's President Herbert Siegel who initiated the Piper purchases frankly acknowledged his unfamiliarity with the aviation business, while insisting that Piper would complement CC's business (Trial Tr. 512–514). Siegel's own personal history of

numerous tenders and aborted bids for other corporations failed to demonstrate any long-term interest in his targets except on one occasion—the acquisition of CC itself. Piper was the only situation in the last several years when Siegel did not sell out after strong purchasing took place and before taking a permanent stance in the target (Trial Tr. 522). The foregoing circumstances bear significantly on the value of ultimate control of Piper to CC.

The value of control to CC was directly related to "the totality of the abilities the new man brings to the firm." Bayne, "The Investment Value of Control Stock" 54 Minn.L.Rev. 1265, 1282 (1970). There has been no showing that the Chris-Craft regime could have in any way altered or improved the Piper picture. If anything, the major value of the control position to CC appeared to be solely as a fulcrum for later sale. To be sure, ultimate control of Piper could well have resulted in various forms of improvement of CC's balance sheet, but such amorphous enhancements are incapable of reasonable valuation. Furthermore, to the extent that CC sought control of Piper for the purpose of being able to integrate the Piper earnings with the CC earnings, that result was accomplished even absent control by an accounting methods change in 1970 which permitted such accounting. (Trial Tr. 1538). Thus, in the long run, CC lost nothing in this regard when it lost the fight for a majority of the stock.

It is significant as well to note that the Piper family and management were, to say the least, staunchly opposed to the CC "invasion". Had CC achieved ultimate control, therefore, the prize would have embraced resistant and difficult personalities and CC would have been forced to undertake a wholesale—and expensive—replacement and reorganiza-

15. Indeed, CC even sought a buy-out from BP of CC's Piper shares through the medium of BP's own tender offer. (Trial Tr. 398). However, such a tender would have placed CC afoul of the statutory prohibitions against "short-swing" purchases and sales, 15 U.S.C. § 78p(b), and BP refused to extend the time of its tender offer to remove that obstacle from CC's path. Gordon stated that CC would have tendered the shares to BP if BP had extended the offering time to accommodate CC's problem. (Trial Tr. 398, 421).

tion of the Piper corporate management structure. A formidable task by any standard, such a course would have been especially doubtful in light of CC's acknowledged attraction to the Piper name and reputation. (Trial Tr. 513). At all events, such a significant future financial and psychological expense is a substantial discount factor to be applied to the ultimate value of control of Piper to CC.

In light of the inability to affix a value to CC's unsuccessful quest for control of Piper (and hence a value to CC for its opportunity to gain that control), the only accurate way of measuring the value of CC's lead position is to determine what CC's position on September 5 was worth to a hypothetical reasonable purchaser.[16]

 But even if CC could have realized the full value of its "plurality position" by a sale, it is not at all clear that the premium, if any, realized thereby could be properly retained by CC. In the atmosphere of recently decided cases, especially where a vocal opposition exists, the exercise of control is bound to be seriously hedged by restrictions protective of minority interests. *Cf.* Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955). *See also* Porter v. Healy, 244 Pa.· 427, 91 A. 428 (1914). *But see* Essex Universal v. Yates, 305 F.2d 572 (2d Cir. 1962). It is clear here that the excess amounts paid by both CC and BP in August of 1969 were, in effect, "anticipation" premiums; the contestants, in other words, were paying prices with an inflation factor that hopefully, in the end, would be repaid by the traditional "control" emoluments to the victorious

bidder. However, between realization of control and the realization of repayment of the premium paid for control are many hazards. Certainly, these factors affect not only what uses control can be put to but also the market value of the control and any attempt to sell it. A contestant who, in the words of expert Wahrsager, allegedly had a "99% chance of gaining control" if it led by 42–37 (Tr. 30) could not, under equitable concepts, sell his plurality position without accountability if the sale of such a position was to deliver control or use it to benefit himself at the minority's expense.

For present purposes, it is enough to note that while the "hypothetical purchaser" method is the only way of determining the value of CC's plurality position before BP acquired 51%, such a method raises substantial questions as to whether the existence of the plurality would have added materially to the per share fair market value at the time— absent the plurality.[17]

Similarly, a number of other factors tend to reduce the "premium" that CC might have expected to realize. CC's hypothetical lead cannot be viewed in a vacuum; its opponent, BP, had exhibited extraordinary tenacity, and quite clearly had committed itself to use any and every resource available to win the contest. Furthermore, BP's energies were fully focused towards control of Piper, for it had contractually committed itself to the Piper family to use its "best efforts" to obtain control. It is thus doubtful that BP would have "dropped out" of the fight, even faced with a five-point deficit.[18] The likelihood of any

---

16. CC correctly points out that the actual *existence* of such a purchaser is immaterial; rather, the "purchaser" must be constructed to determine what value, if any, is *to be ascribed to* CC's lead position on September 5.

17. It goes without saying that any sale of CC's plurality position in August or September, furthermore, would have exposed CC to the pitfalls of the short-swing statutes that it so desperately sought to avoid. 15 U.S.C. § 78p(b); Securities Exchange Act,

§ 16(b). Thus CC was between the Scylla of § 16(b) and the Charybdis of equitable limitations on the sale or use of control.

18. It should be remembered that BP entered the contest with CC, in effect, holding a 33 percentage-point lead. The expert testimony as to the "statistical probability" of the leader going on to victory is sufficiently doubtful as a matter of business experience and common sense in a situation where there is a bidder with greater resources at his command.

third-party expending enormous sums of cash to take over CC's plurality position just for the privilege of continuing the dogfight with BP is unrealistic and slim at best; defendants' expert Mr. Gant, in particular, pointed out that unlikelihood in his testimony (Tr. 502).

█ Furthermore, CC's opponent was not merely BP—it was Piper itself. The Piper family and management had long since displayed its adamant opposition to any takeover by CC. The value of having management on BP's side cannot be minimized, and that is a value that BP alone possessed. Moreover, the "winner" of the contest, whoever it might be, knew full well that it would be faced with a large and highly vocal minority opposition—hardly the ideal corporate situation to maximize the potentialities of control. It goes without saying that whatever majority control is worth where the balance of the ownership is scattered and uncoordinated, a majority position is worth less to a third party where a large minority holding exists. This is particularly so where, as here, the rival interests have displayed a willingness to litigate every issue and there is the capacity to force a costly appraisal proceeding to forestall or hamper the exercise of control.

In short, even assuming *arguendo* that CC's "lead" position possessed a value that was personal to CC and did not already belong to Piper, as in the *Perlman* case, the value of that position could be substantially less than the value of the opportunity to gain control in more normal circumstances. The control fight still raged; CC, even with a lead of 42–37, could not be sure of the outcome and the value of control to a third party if it was indeed achieved was, in any case, questionable. The premium value of CC's hypothetical lead was depreciated accordingly.

*III. Quantifying the Premium*

There was widespread disagreement among the experts as to the dollar value of CC's plurality position.[19] Mr. Wahrsager testified that the ultimate value of control of CC would lift the value of CC's plurality position by 40% above the fair market value, to $72 per share; that figure, he testified, represented what he thought a third-party would have paid for the lead position. (Tr. 9, 32, 62a). Thus, Wahrsager valued the plurality premium at approximately $20 per share, the difference between what he considered to be the fair market value of $52 per share, and the value of CC's plurality position of $72 per share. The economic climate at the time seems not to have influenced Wahrsager's estimations of value. He testified that in September 1969 a pronounced downward market movement started to become manifest until a real collapse in security prices occurred in the summer of 1970. He did not foresee this decline, his statistical studies did not tell him it was coming and he did not take this deterioration into consideration in his valuations. Furthermore, his $20 figure can be taken as little more than an abstract creation. No one had told Wahrsager what value enhancement CC could derive from its control venture nor did he have any objective basis for estimating dollar-wise what benefit CC could reasonably have expected from being in a position to manage Piper and its dividend policies.

The Court has searched vainly in the record for specific identification of the advantages of control to CC reducible to money value.

Professor Murray's calculation, like his fair market value computation, was somewhat more obscure; he persistently eschewed assigning any premium to CC for its plurality position until a leading question finally evoked his acquiescence that such a premium could be as much as 40% over the fair market value (Tr. 167-8). Murray stated that the contestants for control undoubtedly felt that under their management respectively they could make changes in the hope

19. All agreed, however, that the premium given either a 41–31 or 42–37 lead would be identical.

to enhance Piper's earning power. But he did not attempt to identify any of the changes or evaluate them or put any dollar figures on them. He said that there was no way that he could read the minds of the decision makers to figure out what their expectations might be.

Mr. Rosenkranz likewise refrained from assigning any premium to CC's block; he said, "It was not part of our assignment to try to assign a premium based on the hypothesis that Chris Craft had a plurality of the Piper shares." And while his testimony vacillated, Rosenkranz explicitly stated at several points that he would place *no* premium on the lead position because of the ongoing uncertainty of victory even when CC held 41% of the Piper stock despite the prognostications of plaintiff's statisticians to the contrary. (Tr. 267, 306). To be sure, Rosenkranz at times did acknowledge that a lead position could bring some premium (Tr. 228, 309, 320), but nowhere in his testimony did he attempt to assign a premium representing that factor (Tr. 309). It was Mr. Rosenkranz' testimony that the power to choose management cannot be quantified and that there is no way of evaluating the possibility of increasing earnings in the future so as to determine enhancement in value inuring from the acquisition of control. (Tr. 331, 332). Thus, to Mr. Rosenkranz the "value" of CC's plurality position was simply $58 per share (Tr. 306, 320).

At the initial trial, defendants' expert Mr. Fitzgerald fully and accurately analyzed the various components entering into the assignment of a control premium, and concluded that had CC gained a majority of the Piper stock, he would still assign no premium to its position; in his words, a control premium "would not seem to be justified or warranted", (Trial Tr. 1536) since the sole measurable value of control herein would be the utilization of the equity accounting method, and such method became available to holders of 20% or more of a company's stock. *See supra*

pg. 519. Despite repeated cross-examination on the subject, Fitzgerald continued to insist that no premium was warranted, no matter which contestant ultimately gained majority ownership:

Q: As you sit here on this witness stand as an investment banker, can you tell me whether in your opinion a reasonable buyer would be willing today to pay as much per share for Chris-Craft's 42 per cent of Piper as for Bangor Punta's 51 per cent?

A: That is our testimony and that is what I am saying here sitting in this witness box. (Trial Tr. 1585)

Fitzgerald realistically noted that control in the context of the CC—BP battle would be worth very little:

[I]t is our view that in any situation that would be litigious or hostile it would be very difficult to exercise control and to make reasonable business gambles, as would be the case when you were not being constantly second guessed. (Trial Tr. 1539).

Accordingly, Fitzgerald concluded that there would be no premium attached to the ultimate control position of Piper.

Mr. Gant, testifying for defendants at the post trial hearing, stated that CC could readily dispose of its Piper shares only by way of a public offering in which it could be expected to realize $43 per share. Obviously, any premium value would be dissipated in such a public offering (Tr. 431). Nonetheless, as was the case with Fitzgerald, Gant perceptively and persuasively analyzed the components of that plurality premium; he testified that a party seeking control of Piper *where there was no concentrated opposition* would possibly pay a 20% premium (Tr. 520–1)—half the figure named by Wahrsager and Murray. However, Gant, like Fitzgerald, accurately recognized that the situation in the present case was far different, since two large holders were bitterly fighting for control. As previously noted, the counter-balancing block greatly dilutes the value of control, and hence reduces any control premium. In conse-

quence, Gant testified that he too thought there would be no premium value attached to CC's lead of 42% to 37% (Tr. 498), that indeed any third-party stepping into the "messy and complicated" fight might have wanted a discount (Tr. 501–2), and that at most a premium figure between 5% and 10% over fair market value might be garnered for the ultimate control position [not for merely the opportunity to gain control]. (Tr. 521). Gant defended his analysis as follows:

> I am describing an atmosphere in which the holder of the majority has a very vocal minority stockholder who is contesting his position and where the board is divided and where litigation proceeds, [and] that is not an atmosphere that most people want to get into and for which they will pay a premium. (Tr. 521).

Gant together with Fitzgerald emerged as the experts on whom the most reliance could be placed in reaching the damages to be ascertained here; Gant together with Fitzgerald gave the most acceptable and convincing guidance on the issues.

Gant was the only expert to directly explain and quantify the premium that is at the base of this Court's determination, i. e., the premium that exists in a large minority block when that is counterbalanced by another block almost as large that stands in the way of full harmonious utilization of ultimate control if and when that may be acquired.

█ The Court has weighed all the relevant factors indicated in the testimony and reports of the experts and the exhibits introduced at the hearing. The Court has had the opportunity to see and hear the witnesses and to appraise their evidence, its potency and believability in the light of all the facts and circumstances of the trial record and the record of the hearing on the relief to be considered. The Court has appraised the reduction in the appraisal value of CC's Piper holdings attributable to BP's taking a majority position and reducing CC to a minority position. That reduction the Court finds to be $2.40 per share which is the 5% premium above fair market value that the Court finds to have been lodged in a 42% holding of Piper that was erased when BP obtained a majority with illegal purchases of stock on September 5, 1969. These findings reflect weighing of the inflating and deflating factors heretofore indicated upon the range of values of all relevant components.

The evidence persuasively established that actual majority control was worth between 5% and 10% above fair market value of Piper stock in the circumstances of this case with a block of 37% or 42% of the total capital opposing the majority. Certainly then, the *opportunity* (speculative at best) of gaining a majority from a 42% plurality is generously valued at 5% above fair value of the stock, in such circumstances.

Accordingly, the total damages to be awarded to CC are $1,673,988. ($2.40 times the total number of shares held by CC on September 5, 1969, (697, 495)).[20]

## IV. Injunction

The Court of Appeals ordered this Court to "include in its judgment an injunctive provision barring BPC from voting for a period of at least 5 years the Piper shares it obtained through the unlawful May cash purchases and those it obtained through its exchange offer." 480 F.2d at 380.

█ Injunctions are extraordinary legal remedies; they are granted sparingly, and granted only under terms which insure the protection of all parties—including the party enjoined. *See* Brotherhood of Locomotive Engi-

---

20. The Court of Appeals held that CC was under no duty to withdraw from the contest prior to September 5 and thus mitigate damages (480 F.2d at 376), despite the admission by CC's officers and experts that the fight was "lost" well prior to that date. (Tr. 30, 264–5, 681, 693, Trial Tr. 459).

neers v. Missouri-Kansas-Texas R. R. Co., 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed. 2d 1379 (1960); Galella v. Onassis, 487 F.2d 986 (2d Cir. 1973); Greater Iowa Corp. v. McLendon, 378 F.2d 783 (8th Cir. 1967); New York, Chicago & St. Louis R. R. Co. v. Brotherhood of Locomotive Firemen & Enginemen, 358 F.2d 464 (6th Cir. 1966). Injunctions must therefore be carefully fashioned to fit the particular facts presented. As one Court so aptly put it:

> An injunction decree should conform to the requirements of the case; it should give relief from the wrong committed but it should not be so broad as to inflict an unwarranted injury on the defendant. Servisco v. Morreale, 312 F.Supp. 103 (E.D.La. 1970).) *See also* Goldberg v. Trakas, 206 F.Supp. 867 (E.D.S.C.1962).

 The power of the District Court to attach protective conditions, if warranted, to an injunctive decree is too clear to admit of serious dispute. *See, e. g.,* Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); Salsbury v. United States, 123 U.S.App.D.C. 69, 356 F.2d 822 (D.C. Cir. 1966); J. M. Fields of Anderson, Inc. v. Kroger Co., 330 F.2d 686 (5th Cir. 1964); Professional Sports, Ltd. v. Virginia Squires Basketball Club, 373 F.Supp. 946 (W.D.Tex.1974); Puerto Rico International Airlines, Inc. v. International Association of Machinists & Aerospace Workers, 366 F.Supp. 646 (D. Puerto Rico 1973). And nowhere are the broad powers of the Court with respect to injunctions clearer than in cases involving federal securities law violations. *See* J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); S. E. C. v. Golconda Mining Co., 327 F.Supp. 257 (S.D.N.Y.1971).

 Furthermore, it is perfectly appropriate for the Court, when necessary, to impose terms and conditions upon the party at whose instance it proposes to act. Inland Steel Co. v. United States, 306 U.S. 153, 156, 59 S.Ct. 415, 83 L.Ed. 557 (1939); Meyers v. Block, 120 U.S. 206, 214, 7 S.Ct. 525, 30 L.Ed. 642 (1887); Russell v. Farley, 105 U.S. 433, 438, 26 L.Ed. 1060 (1882) (noting that such power has been recognized and exercised by courts "from time immemorial"). *See also* Burford v. Sun Oil, 319 U.S. 315, 333 n. 29, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

In short, in perhaps no other instance is the District Court more clearly given the power—and indeed the duty—to mold and shape the relief to fit the circumstances before it.

> [E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable . . . In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . .. Lemon v. Kurtzman, *supra,* 411 U.S. at 200–201, 93 S.Ct. at 1469 (Burger, Ch. J.).

The situation presently before the Court calls for precisely the sort of customized relief envisioned by the cases cited above. BP must be deprived of unfairly benefitting from its unlawful stock purchases, yet CC must not be fortuitously placed in a position where it will be able to alter BP's investment beyond the life of the Court-ordered injunction. The Court of Appeals squarely refused to hold that CC would have gained control of Piper absent BP's conduct. This Court's injunction therefore should not award CC a benefit to which it would not otherwise be entitled. It is clear that the damage awarded fully compensates CC for the interference with its opportunity to gain control of Piper; the injunction is aimed, in contrast, at enjoining BP, not further rewarding CC.[21]

Events since September of 1969 and particularly during 1974 make special

---

21. To be sure, CC will probably take management "control" of Piper during the injunction period, and such a shift is not in conflict with the Court of Appeals' mandate. CC may thus, if it be so advised, alter management policies during the injunction period.

fashioning of this injunction particularly appropriate. For here, it is undisputed that both CC and BP have recently (perhaps with an eye to the ultimate resolution of this lawsuit) resumed purchasing Piper stock on the market. As of June 7, 1974, the parties owned the following Piper shares, out of 1,644,790 shares outstanding as compared with their respective investment on September 5, 1969:

| | 1969 | 1974 |
|------|---------|---------|
| BP | 832,706 | 857,921 |
| CC | 697,495 | 708,300 |

Therefore, an injunction prohibiting BP from voting that portion of its Piper shares that were unlawfully acquired, places CC in the position of having 708,300 of the 1,413,788 shares of Piper eligible to vote, or more than 50%. Clearly this would lift CC into benefits which its position in 1969 could not achieve by according to it the same powers of permanently altering the minority investments through merger, issuance of new stock, recapitalization, dividend policies, or the like.[22] Unless restricted appropriately, CC would thereby be able to convert the "temporary" injunction ordered by the Court of Appeals into a permanent prize. If the Court of Appeals had desired to grant such a license to CC, the injunction ordered would have been permanent, not temporary. It is, therefore, against this background that the injunction must be fashioned—keeping in mind the Court of Appeals' caveat that divestiture of the questioned ownership was not required and that the control battle should not be reopened. 480 F.2d at 379.

■■■ The proper balance can best be achieved by simply rolling back the calendar to September 5, 1969, much as was done for the damage inquiry. The parties should revert to their status as on that date, with BP's illegally purchased shares enjoined from voting the stock for a lengthy period. Concurrently, the corporate status of Piper should be likewise frozen as at that date for the period of the injunction. The charter and by-laws of Piper shall revert to the form and content as they existed on September 4, 1969 and shall unless otherwise ordered by the Court, continue in that form and content during the period of the injunction granted hereby.

Similarly, unless otherwise ordered, no stock, rights, options or other devices capable of expansion of capital may be issued by the Corporation or from the Piper treasury during the injunction to alter the September configuration and no merger, dissolution, liquidation or redemption of securities shall be made; and no debt or obligation, not in the ordinary course of business shall be incurred or placed; except in accordance with the laws of Pennsylvania and pursuant to the charter and by-laws as constituted on September 4, 1969.

The period of this injunction was determined by the Court of Appeals to be not less than five years. The parties have operated as a *de facto* regency—albeit reluctantly—for some five years since the inception of this lawsuit. For better or worse, BP, while clearly exerting its majority influence in certain situations, has been stifled in fact from exercising that control in others. Undoubtedly, the spectre of a large and vocal minority block constricted BP (and perhaps, during the injunction period, CC) from acting as it [or they] would have without such a watchdog. To that extent at least, BP has already been "enjoined" in fact from utilizing the full benefits of its majority position. Nonetheless, the Court cannot agree with BP's contention that the injunction peri-

22. The stock ownership of CC to the present date has never provided it with enough votes at any time to elect more than three of an eight man board or four of a ten man board. And even if BP could not have voted the illegally acquired shares (231.002) and the outstanding shares entitled to vote are reduced by that amount, CC through September 5, 1969, at no time had enough shares to elect a majority of the board nor did it have the power to vote a merger of Piper.

od should be deemed satisfied. Therefore, the period of the injunction ordered by this Court should commence with the filing of the decree on this opinion for the five years recommended.

In addition, this Court will retain jurisdiction during the pendency of the injunction in order to remold or modify the injunction if such a course becomes necessary or appropriate due to any change in circumstances actual or prospective. *See* American Optical Co. v. Rayex Corp., 291 F.Supp. 502 (S.D.N.Y. 1967), aff'd, 394 F.2d 155 (2d Cir.), cert. denied, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968); In re Certain Carriers, etc., 241 F.Supp. 1004 (D.D.C. 1965).[23]

## V. Other Relief

■ Plaintiff has, in addition, requested that the interest charges it has borne on loans which financed its Piper investment be awarded to it as consequential damages. Plaintiff contends that its "locked-in" position has precluded the possibility of any escape from Piper, and thus such interest charges are properly recoverable.

■■ There has been no showing that CC has been "locked-in" so that sale of its Piper stock has been impossible. Indeed, the proof adduced at the present hearing was directed precisely at determining the discount due to the minority position. The cost of the use of credit or margin to acquire stock is not a proper element of damage to a purchaser's interest. Moreover, an award of such interest herein would stretch the Court of Appeals' mandate beyond its properly intended limits. Consequential damages are awarded only upon a clear showing of causal connection with the misconduct and the consequence claimed. Zeller v. Bogue Electric Mfg. Corp., 476 F.2d 795 (2d Cir.), cert. denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973). Such a showing has not been and cannot be made

here for purposes of an award of interest to CC on the unpaid portion of the purchase price of the Piper stock acquired by CC.

■ Plaintiff also seeks prejudgment interest on the recovery from the date of the wrong. Where, as here, a claim for relief is federally created, the allowance of interest is to be decided by federal law. *See* Note, Interest on Judgments in the Federal Courts, 64 Yale L. J. 1019, 1040 (1955) (hereafter cited as "Note"). *See also* Perkins v. Standard Oil Co. of California, 487 F.2d 672, 675 (9th Cir. 1973); Briggs v. Pennsylvania R. R. Co., 164 F.2d 21, 22 (2d Cir. 1947), affirmed without consideration of this point, 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948); Murphy v. Lehigh Valley R. R. Co., 63 F.Supp. 928, 929–930 (E.D.N.Y.1945), modified, 158 F.2d 481 (2d Cir. 1946). State statutes in respect of prejudgment interest, *e. g.*, N.Y.C.P.L.R. § 5001(b) (McKinney's Supp.1973), are thus inapplicable. *See Note, supra*, at 1040.

■ Prejudgment interest may be awarded where provision therefor is made in the federal statute which creates the federal remedy. *See* 10 Wright & Miller Federal Practice and Procedure § 2664 (1973). In the absence of a specific statute, the operative statute is 28 U.S.C. § 1961. *See Note, supra* at 1040. The federal securities laws are silent in respect of interest. Section 1961 provides, in pertinent part, as follows:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law.

Thus, the statutory authority provides only for interest on a money judgment, and thus "would seem to exclude the inference that interest should be allowed upon verdicts before judgment." Massachusetts Benefit Assn. v. Miles, 137 U.S.

---

**23.** The final form in which the injunctive relief was cast is set out in the Appendix hereto.

689, 691, 11 S.Ct. 234, 235, 34 L.Ed. 834 (1891). *But see* Louisiana & Arkansas Ry. Co. v. Export Drum Co., 359 F.2d 311, 317 (5th Cir. 1966) (§ 1961 inapplicable to the question of whether prejudgment interest is a proper element of damages).

Nonetheless, a number of Courts which have considered the question of prejudgment interest in federal securities cases have ruled that the absence of statutory authority other than § 1961 has left the award of equitable prejudgment interest to the discretion of the Court, to be decided by balancing the equities and weighing notions of fairness to the parties. *See, e. g.,* Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Wolf v. Frank, 477 F.2d 467 (5th Cir. 1973, cert. denied, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973), rehearing denied, 414 U.S. 1104, 94 S.Ct. 739, 38 L.Ed.2d 560 (1973); Wessel v. Buhler, 437 F.2d 279 (9th Cir. 1971); Norte & Co. v. Huffines, 416 F.2d 1189 (2d Cir. 1969), cert. denied sub nom., Muscat v. Norte & Co., 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970); Speed v. Transamerica Corp., 135 F. Supp. 176 (D.Del.1955), affirmed, 235 F.2d 369 (3rd Cir. 1956); Pearlstein v. Scudder & German, 346 F.Supp. 443 (S.D.N.Y.1972); Ross v. Licht, 263 F. Supp. 395 (S.D.N.Y.1967); Collier v. Granger, 258 F.Supp. 717 (S.D.N.Y. 1966); Pappas v. Moss, 257 F.Supp. 345 (D.N.J.1966), rev'd other grounds, 393 F.2d 865 (3rd Cir. 1968); Perfect Photo, Inc. v. Grabb, 205 F.Supp. 569 (E.D. Pa.1962). *Cf.* Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939) ("[I]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness.").

The foregoing decisions have not adverted to the question whether Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) had any significant impact on notions of the common law that recognized discretionary power to increase damages by interest awards or the effect if any of the post-*Erie* reenactment of 28 U.S.C. § 1961, which squarely addressed the question of interest.

Interest on the obligations created by the securities laws is or is not payable depending upon the purpose of the statutory enactment as applied and upon principles of equity. In equity, the allowance of interest supplies a means of compensating a creditor for loss of use of his money. Thus, recoveries of one's own money through claims bottomed on Sections 12 and 17 of the '33 Act and 10(b) of the '34 Act readily fall within a debtor-creditor relationship; and equity may quite properly supply prejudgment interest awards in such cases.

However, where the statute is used to vindicate the prophylactic purposes of the law and a private recovery is therefore allowed to a litigant in the posture of this plaintiff, there is a question whether the equitable principle should apply. If the allowance of interest on such an obligation "would serve only to increase the penalty and not to compensate for loss of use of money owing a creditor" (United States v. United Drill & Tool Corp., 87 U.S.App.D.C. 236, 183 F.2d 998, 1000, 1950), allowance of interest becomes questionable.

No instructions with respect to allowance of interest were included in the mandate.[24] However, the basis for and object of the damage award found by the Court of Appeals seem intended to carry the addition of prejudgment interest on the recovery as quantified herein. Consequently, such interest is allowed and shall be computed on the recovery from September 5, 1969 at the

24. The entire problem of interest becomes obviated for a District Court when Rule 37 of the Federal Rules of Appellate Procedure is utilized. That provides that where the District Court's judgment is reversed, the mandate "shall contain instructions with respect to allowance of interest."

legal rate and included in the decree to be entered.

■ Finally, plaintiff has requested an award of attorney's fees, arguing that a public rather than a selfish interest has been served by this litigation. *See* SEC v. Capital Counsellors, Inc., 378 F.Supp. 224 (S.D.N.Y.1974). If anything is clear concerning this lengthy and bitterly fought litigation, it is that service of the public interest was not CC's motivation and any such service has been wholly incidental and has been amply satisfied by the damages awarded to CC. The law in this country has not yet reached the point of rewarding victorious litigants with counsel fees in the circumstances here present; at all events, such an award in this case is not warranted and is denied.

Costs are awarded to the plaintiff to be taxed by the Clerk.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a) Fed.R.Civ.P.

The parties may submit a decree accordingly conforming with Rule 54(a) Fed.R.Civ.P. for consideration by the Court.

So ordered.

## APPENDIX

### IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That the 231,002 shares of Piper Aircraft Corporation ("Piper") now owned by Bangor Punta, and acquired by it through cash purchases in May, 1969 from Fund of Funds Proprietary Fund, Inc., American Securities Corporation and Bay Securities Corporation and in an exchange offer in July, 1969 to the then shareholders of Piper, shall be considered, authorized and outstanding for all purposes under the laws of Pennsylvania and under this decree, but shall not be voted hereafter by or on behalf of Bangor Punta or counted for quorum purposes for a period of five years and Bangor Punta be and hereby is enjoined accordingly. To the extent that any of such 231,002 shares shall be transferred to former Piper shareholders who accept Bangor Punta's offer of rescission pursuant to the decree of this Court dated May 3, 1974 in S. E. C. v. Bangor Punta, 70 Civ. 3940, the transferred Piper shares shall be free of this injunction and the voting thereof shall not be restrained by anything contained in this decree.

2. That the changes in Piper's By-Laws and in the size of Piper's Board of Directors since September 4, 1969 shall be rescinded and during the period of the injunction granted by this Decree Piper's By-Laws and the size of its Board shall be reinstated and together with its charter shall remain as they were constituted on September 4, 1969, unless otherwise agreed by the plaintiff and the defendant Bangor Punta or ordered by the Court for good cause shown.

3. That the individual defendants Nicholas M. Salgo, David W. Wallace and William T. Piper, Jr., together with the representatives of Bangor Punta on the Piper Board, at the next meeting of said Board scheduled for December 2, 1974, shall vote for resolutions to cause Piper to convene a meeting of its stockholders for the purpose of electing directors, the meeting to take place within approximately ninety (90) days of such Board action, and at the same meeting to take the necessary action to immediately reinstate Piper's By-Laws as directed above except for the provision which expanded the Board from eight to ten members; the requirement to restore the size of the Board to eight members is to take effect the day of the said stockholders' meeting. In the intervening period between the call of the stockholders' meeting and the meeting itself, on consent of Bangor Punta, no action shall be taken at a Board meeting of the Piper Board without the consent of the four representatives of Chris-Craft on the Board and Piper shall not seek or be caused to seek proxies for any designee for the said election of directors.

4. That no shares of Piper owned by Chris-Craft or Bangor Punta and no rep-

resentative of the stockholdings in Piper owned by either corporation, or, holding office as a director of Piper shall vote for or acquiesce in (1) the issuance of any stock, rights, options or other devices capable of increasing the outstanding voting shares of Piper beyond the number outstanding as of September 4, 1969, or (2) redemption, reduction, or purchase by Piper of Piper's voting shares outstanding as of September 4, 1969, or, (3) a merger, dissolution or liquidation of Piper, unless the same is ordered by the Court.

5. That the Court will retain jurisdiction during the pendency of the injunction granted to modify said injunction if such a course becomes necessary or appropriate due to any change in circumstances actual or prospective.